# **<u>EXHIBIT A</u>**



Mitchell Hamline Law Review

Volume 48 | Issue 2                                                    Article 3

2022

# The Other Bar Hurdle: An Examination of the Character and Fitness Requirement for Bar Admission

David L. Hudson Jr.

Andrea Gemignani

Follow this and additional works at: https://open.mitchellhamline.edu/mhlr

Part of the Legal Education Commons, Legal Ethics and Professional Responsibility Commons, and the Legal Profession Commons

Recommended Citation
Hudson, David L. Jr. and Gemignani, Andrea (2022) "The Other Bar Hurdle: An Examination of the Character and Fitness Requirement for Bar Admission," *Mitchell Hamline Law Review*: Vol. 48 : Iss. 2 , Article 3.
Available at: https://open.mitchellhamline.edu/mhlr/vol48/iss2/3

This Article is brought to you for free and open access by the Law Reviews and Journals at Mitchell Hamline Open Access. It has been accepted for inclusion in Mitchell Hamline Law Review by an authorized administrator of Mitchell Hamline Open Access. For more information, please contact sean.felhofer@mitchellhamline.edu.
© Mitchell Hamline School of Law



# THE OTHER BAR HURDLE: AN EXAMINATION OF THE CHARACTER AND FITNESS REQUIREMENT FOR BAR ADMISSION

David L. Hudson, Jr.[1] and Andrea Gemignani[2]

I.    INTRODUCTION ..................................................................501
II.   BRIEF HISTORICAL BACKGROUND...................................503
III.  OVERVIEW OF CURRENT PROCESS AND COMMON
FACTORS FOR DENIAL OF CHARACTER CERTIFICATION ...........505
      A. Overview of Character and Fitness Process ......................505
      B. Common Factors for Denial of Character Certification .....510
IV.   CRITICISMS OF THE CHARACTER AND FITNESS
PROCESS ...............................................................................513
      A. Ineffective Proxy for Intended Purpose............................513
      B. Inherent Subjectivity, Implicit Bias, Arbitrary Application &
      Resulting Lack of Predictability.................................................514
      C. Potentially Insurmountable Hurdle for Individuals with Prior
      Criminal Convictions ............................................................516
      D. Continued Discriminatory Effects ....................................520
            1.   Unintended Consequence of Discouraging Applicants
            of Color and Magnifying the Effects of a Discriminatory
            Criminal Justice System .....................................................520
            2.   ADA Violations & Consequences for Applicants
            Seeking Needed Mental Health and Substance Abuse
            Treatment ..........................................................................521
            3. Socioeconomic Impact of Considering Financial
            Obligations........................................................................526
      E. Direct Costs of Time & Money...........................................526
      F. Constitutional Concerns ...................................................528
            1. Lack of Due............................................................528
            2. First Amendment Concerns and Social Media..............528
V.    JUSTIFICATIONS.............................................................529
VI.   REFORMING THE SYSTEM ...............................................534
VII.  INCREASED USE OF CONDITIONAL ADMISSION .............536
VIII. CONCLUSION .................................................................537

[1] David L. Hudson, Jr. is an assistant professor of law at Belmont University College of Law. He is the author, co-author, or co-editor of more than forty books. He regularly writes on ethics issues for the ABA Journal. He also regularly represents applicants in character and fitness proceedings before the Tennessee Board of Law Examiners.
[2] Andrea Gemignani is a visiting assistant professor of legal practice at Belmont University College of Law.

# I.   INTRODUCTION

To become a licensed attorney, law school graduates must pass the dreaded bar exam, a two or three-day,[3] grueling exam that has been characterized as a brutal and hellish experience.[4] Many attorneys describe the exam as "among the most painful experiences of their lives."[5] But, there is a lesser known yet equally as important hurdle that bar applicants also must overcome—the character and fitness inquiry. Applicants have the burden to show that they are morally fit to practice law.[6] They must reveal a plethora of personal information, dating back years or even decades, depending on the age of the applicant.[7] They must reveal arrests, convictions, speeding tickets, bankruptcies, court judgments, employment discharges, and much more.[8] For some applicants, this may prove to be the most challenging part of the admission process.[9]

In her seminal work in 1985, Professor Deborah Rhode explained the dual purposes of the character and fitness requirement: (1) protecting the public given their inherent vulnerability created by the disproportionate knowledge of lawyers and the required trust for essential matters, and (2) protecting the courts and administration of justice from those who are dishonest (disposed to perjury or bribery).[10] Rhode also opined that there had not previously been "comprehensive historical or empirical research on the American bar's character mandates, and no systematic scrutiny of their underlying premises."[11] Despite Rhode's effective scrutiny and the continued scholarly criticisms of the practice over the intervening thirty-six years, the character and fitness requirement remains an entrenched part of

---

[3] The vast majority of bar exams are two days. However, a few states—such as Delaware—still have three-day long bar exams. *Board of Bar Examiners of the Supreme Court of Delaware*, DEL. CT., https://www.courts.delaware.gov/bbe/ [https://perma.cc/9VE9-RCQW].

[4] Abigail Johnson Hess, *'Literal Hell'—How the Pandemic Made the Bar Exam Even More Excruciating for Future Lawyers*, CNBC (Aug. 19, 2020), https://www.cnbc.com/2020/08/19/literal-hellthe-pandemic-has-made-the-bar-exam-more-excruciating.html [https://perma.cc/ZVP9-YZ77]; Joe Patrice, *Bar Examiners Need to Chill the Hell Out*, ABOVE THE LAW (Apr. 20, 2021), https://abovethelaw.com/2021/04/bar-examiners-need-to-chill-the-hell-out/ [https://perma.cc/GSX8-CRS7].

[5] *See* Hess, *supra* note 4.

[6] David L. Hudson, Jr., *Honesty Is the Best Policy for Character-and-Fitness Screenings*, 102 A.B.A. J. 22 (June 1, 2016), https://www.abajournal.com/magazine/article/honesty_is_the_best_policy_for_character_and_fitness_screenings [https://perma.cc/Y3RU-HNS7].

[7] *Id.*

[8] *Id.*

[9] Joseph A. Valerio, *The Impact of the Character and Fitness Honesty and Financial Responsibility Requirements on Underprivileged Groups*, 30 GEO. J. LEGAL ETHICS 1093, 1093 (2017).

[10] Deborah L. Rhode, *Moral Character as a Professional Credential*, 94 YALE L.J. 491, 508–09 (1985).

[11] *Id.* at 493.

the bar application process.[12] In fact, Rhode and others have referred to the character and fitness requirement as the one "fixed star" of the bar admission process.[13] Therefore, as the legal community focuses on revamping the dreaded bar exam to better fulfill its intended purpose,[14] reconsideration of the character and fitness inquiry as part of the attorney licensing process should be part of the discussion as well.[15]

This Article seeks to survey the criticisms, possible justifications, and proposals for change to the character and fitness requirements for admission to state bars in the United States. While there is some state variation, the general process and the requirement of proving "good moral character" are similar.[16] Therefore, while we will provide specific state examples to highlight inconsistencies of application, we will focus on the National Council of Bar Examiners ("NCBE") as a standard example, since it provides character and fitness investigations on behalf of almost half of the states.[17] Section II provides historical background regarding the character and fitness requirements, including the intended purpose and its discriminatory origins. Section III offers an overview of the current process for investigating character and fitness and identifies some of the common issues that trip up bar applicants. Section IV summarizes the many scholarly criticisms and highlights the inequities and unintended consequences of the current system. Section V seeks to explain the reasons why character and fitness investigations remain in all fifty states despite the many valid criticisms. Sections VI and VII outline some proposed changes to the character and fitness process, including a recommendation that states expand the appropriate use of conditional admission in cases that warrant valid concern but should not establish a flat bar. In conclusion, this Article acknowledges character and fitness inquiries in some form are likely here to stay,[18] and it seeks to highlight those proposals with the best chance of being implemented to improve the current process and identify the necessary next steps for meaningful change.[19]

---

[12] *See id.*

[13] *Id.* at 496.

[14] *See* Stephanie Francis Ward, *Big Changes for Bar Exam Suggested by NCBE Testing Task Force*, A.B.A.J. (Jan. 4, 2021), https://www.abajournal.com/news/article/big-changes-for-bar-exam-suggested-by-ncbe-testing-task-force [https://perma.cc/D3P9-X47K].

[15] *See infra* Section V.

[16] *See infra* Section III; *see also, e.g.*, Nat'l Conf. Bar Exam'rs & Am. Bar Ass'n., Comprehensive Guide to Bar Admission Requirements (Judith A. Gundersen & Claire J. Guback eds. 2021), https://www.americanbar.org/content/dam/aba/publications/misc/legal_education/2021-comp-guide.pdf [https://perma.cc/RN5B-75TW] [hereinafter NCBE Guide] (listing bar admission requirements).

[17] *See id.* at 5–6 (listing which states use separate entities to evaluate character and fitness).

[18] *See infra* Section VIII.

[19] *See infra* Section VI.

## II.   Brief Historical Background

The history of requiring advocates to demonstrate their moral fitness dates back to ancient times.[20] During fourth century BCE, Aristotle recommended that public orators be "men of good character" to be convincing in their presentations.[21] The Theodesian Code in fifth century CE required advocates to be of "suitable character."[22] English law, the foundation for much of American jurisprudence, required lawyers to be not only "skillful" but also "honest."[23]

In early America, during colonial times, lawyers often had to have references from ministers before practicing in the courts.[24] Other states simply required the good word of a practicing attorney or certification from a judge.[25] But character screening was sporadically enforced at best.[26] Some attorneys, such as future President Andrew Jackson and U.S. Senator Thomas Benton, were admitted to practice despite questionable conduct, such as engaging in duels.[27] Perhaps the most notorious historical example of a nefarious individual becoming an attorney was the infamous John Wesley Hardin, the so-called "Dark Angel of Texas," who killed thirty to forty men before becoming a lawyer.[28]

In the 1920s and 1930s, states began developing what has become the current character and fitness process, with requirements for applicants to demonstrate good moral character and special committees to interview candidates to test their fitness.[29] For example, the New York bar was one of the first to establish a character and fitness committee to interview prospective attorneys, and thus also one of the first to have its denial of admission challenged and overturned by courts that found their inquiries inappropriate.[30] The California bar, by contrast, proposed the development of a type of residency program for lawyers where attorneys could only be admitted to practice after studying under a licensed attorney and being

---

[20] *See* Carol M. Langford, *Barbarians at the Bar: Regulation of the Legal Profession Through the Admissions Process*, 36 Hofstra L. Rev. 1193, 1196 (2008).

[21] *Id.* at 1196–97.

[22] *Id.* at 1197.

[23] Roger Roots, *When Lawyers Were Serial Killers: Nineteenth Century Visons of Good Moral Character*, 22 N. Ill. U. L. Rev. 19, 19 (2001).

[24] *See, e.g.,* Richard L. Sloane, *Barbarians at the Gate: Revisiting the Case of Matthew F. Hale to Reaffirm that Character and Fitness Evaluations Appropriately Preclude Racists from the Practice of Law*, 15 Geo. J. Legal Ethics 397, 407 (2002).

[25] *Id.*

[26] Aaron M. Clemens, *Facing the Klieg Lights: Understanding the "Good Moral Character" as a Professional Credential*, 40 Akron L. Rev. 255, 258 (2007).

[27] *Id.* at 261–62.

[28] *See* Leon Metz, John Wesley Hardin: Dark Angel of Texas 211 (1996).

[29] *Attorney and Client—Character Requirements for Admission to the Bar*, 40 Yale L.J. 304, 304–05 (1930) (citing Holmgren, *A Synopsis of the Present Requirements for Admission to the Bar in the States and Territories of the United States*, 5 Am. L. S. Rev. 735, 736 (1928)).

[30] *Id.* at 304 (citing *In re* Brennan, 243 N.Y.S. 705 (App. Div. 1930)).

recommended by that attorney for admission.[31] Similarly, around this time, scholars began to question the effectiveness and appropriateness of state character and fitness requirements more generally, including the outer boundaries of appropriate inquiry and the preference for a system that focused on demonstrated and observed conduct.[32]

From a historical perspective, the sporadic enforcement across the country was also riddled with discrimination.[33] Countless African American attorneys were denied admission to the bar, a pattern of stark racial exclusion.[34] Sometimes, racial minorities were denied admission by local character and fitness panels even though they cleared all requisite hurdles.[35]

In the late nineteenth century, character and fitness requirements also were used to justify the systematic exclusion of women from the practice of law.[36] The U.S. Supreme Court infamously upheld the exclusion of Myra Bradwell from the Illinois bar, based on its expressed belief that women did not possess the character necessary to be attorneys.[37]

Legal ethics expert Keith Swisher is correct when he warns that "the real story hardly reveals a time-honored tradition."[38] He recounts a history of discrimination in the early twentieth century against racial minorities, Eastern European immigrants, and a general desire of some in the bar to reduce competition by excluding others.[39]

In the 1950s and 1960s, the targets were Communists.[40] For example, the Illinois bar—just like it did to Myra Bradwell—infamously excluded University of Chicago instructor and researcher George Anastaplo because he refused to answer questions about whether he had been a member of the Communist Party, a denial upheld by the Supreme Court.[41] Fortunately, the Supreme Court explained in a similar case, involving an applicant who may have had previous ties to the Communist party, that "[a] State can require high standards of qualification, such as good moral character or proficiency

---

[31] *Id.* (citing 1 STATE BAR OF CALIFORNIA, PROCEEDINGS 197 (1928)).

[32] *See, e.g., id.* at 304–05.

[33] Lindsey Ruta Lusk, *The Poison of Propensity: How Character and Fitness Sacrifices the "Others" in the Name of "Protection,"* 2018 U. ILL. L. REV. 345, 349 (2018) (noting that the character and fitness process has a "checkered history").

[34] John G. Browning, *Righting Past Wrongs: Posthumous Bar Admissions and the Quest for Racial Justice,* 21 BERKELEY J. AFR.-AM. L. & POL'Y 1, 2 (2021).

[35] *Id.*

[36] Bradwell v. Illinois, 83 U.S. 130, 141 (1872) (Bradley, J., concurring) (noting that "[t]he natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life"); *see also* Rhode, *supra* note 10, at 497 (noting that "[t]he only substantial group effectively excluded on grounds of character seems to have been women").

[37] *Bradwell,* 83 U.S. at 142 (1872) (Bradley, J., concurring).

[38] Keith Swisher, *The Troubling Rise of the Legal Profession's Good Moral Character,* 82 ST. JOHN'S L. REV. 1037, 1040 (2008).

[39] *Id.* at 1040–41.

[40] *Id.* at 1042.

[41] *In re* Anastaplo, 366 U.S. 82, 96–97 (1961).

in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law."[42] This requirement of rational connection is still the standard today.[43]

### III.   OVERVIEW OF CURRENT PROCESS AND COMMON FACTORS FOR DENIAL OF CHARACTER CERTIFICATION

#### A.  Overview of Character and Fitness Process

In collaboration with the American Bar Association ("ABA") Committee on Legal Education and Admission to the Bar, the NCBE annually publishes a Comprehensive Guide to Bar Admission Requirements for all fifty states.[44] This Guide includes a Code of Recommended Standards with suggestions for how states should conduct character and fitness investigations and what should be considered relevant for admission.[45]

According to the NCBE Recommended Standards (and consistent with Rhode's identified dual purposes for character inquiries), the stated purpose of a character and fitness investigation is "protection of the public and the system of justice."[46] To this end, NCBE identifies the following factors as "relevant conduct" or red flags in bar examiners' investigations for prospective lawyers:

- unlawful conduct
- academic misconduct
- making of false statements, including omissions
- misconduct in employment
- acts involving dishonesty, fraud, deceit, or misrepresentation
- abuse of legal process
- neglect of financial responsibilities
- neglect of professional obligations
- violation of an order of a court
- evidence of mental or emotional instability
- evidence of drug or alcohol dependency
- denial of admission to the bar in another jurisdiction on character and fitness grounds
- disciplinary action by a lawyer disciplinary agency or other professional disciplinary agency of any

---

[42] Schware v. Bd. of Bar Exam'rs of N.M., 353 U.S. 232, 239 (1957).

[43] Id.

[44] NCBE GUIDE, supra note 16.

[45] Id.

[46] Id. at vii.

jurisdiction[17]

In practice, this means bar examiners can (and do) ask applicants to reveal information about arrests for misdemeanors and traffic violations, oftentimes even if they occurred when the applicant was a minor or were dismissed or expunged.[18] Similarly, the NCBE's relevant conduct factors allow inquiry into many financial matters, such as unpaid credit card accounts, student loan debt, and even child support obligations.[19]

In fact, based on these identified categories of relevant conduct, the current NCBE sample Character and Fitness Application, which was most recently revised in January 2021, is thirty-six pages long and continues to seek extensive information regarding the applicant including:

- citizenship status
- all residences and employment for the previous ten years with contact information for verification
- any previous bar admission in any state or court
- any other professional licenses
- any prior grievances or discipline related to prior admission or licenses, including providing copies of any related complaint
- educational history for law school and college, including both academic and disciplinary warnings
- mental health and substance abuse conditions and treatment
- involvement in any civil actions, including for divorce or child support with a requirement to provide copies of all pleadings
- any traffic violations at any time involving alcohol or drugs, including providing copies of all related documents
- any other moving traffic violations within the last ten years, including matters that were dismissed or expunged
- all criminal arrests and charges, except those resolved in juvenile court, even if dismissed or otherwise resolved without conviction, including providing copies of all related documents
- Any defaulted loans, revoked credit accounts or other debt more than 120 days past due;

---

[17] *Id.* at viii.

[18] *See e.g.*, NAT'L CONF. BAR EXAM'RS, NCBE Character and Fitness Sample Application, https://www.ncbex.org/dmsdocument/134 [https://perma.cc/EJD6-NYWL] (last revised Jan. 12, 2021); *see also* NCBE GUIDE, *supra* note 16, at vii–ix.

[19] *See* NAT'L CONF. BAR EXAM'RS, *supra* note 16, at viii.

- Any bankruptcy petitions; and
- Six personal references (not previously provided to verify employment history).[50]

The NCBE uses this sample application (or something similar) to conduct character and fitness investigations on behalf of many states while other states conduct their own initial investigations seeking information on many similar grounds.[51] The application's expansiveness and intrusiveness alone raises questions about whether such an inquiry is necessary or relevant to the practice of law.[52] More specifically, critics have asked whether any or all of this required information actually furthers the cited protective purposes of the character and fitness requirements.[53]

To add to the burden on applicants, most states expressly require full disclosure of all requested information and make false statements or failure of disclosure a reason to deny admission.[54] Thus, the number one rule for bar applicants should be that it is better to reveal than to conceal. The duty of candor is paramount in the bar application process.[55] If a bar applicant fails to disclose key information, such as a DUI arrest in another state or academic misconduct charges in college or law school, the damage could be fatal to the person's chances for admission.[56] If a character and fitness committee views an applicant as dishonest, the applicant likely will not become a licensed attorney.[57]

Even after revealing such extensive personal information, for any individual who discloses prior conduct that raises a "red flag," the investigation is only just the beginning, and NCBE directs that bar examiners should consider all the following factors in determining whether

---

[50] Nat'l Conf. Bar Exam'rs, *supra* note 48.

[51] *See id.*; Nat'l Conf. Bar Exam'rs, *supra* note 16 ("On behalf of participating jurisdictions, NCBE conducts character and fitness investigations on applicants seeking a license to practice law. Not all jurisdictions use NCBE's investigation services.").

[52] *See* Leslie Levin, Christine Zozula & Peter Siegelman, *The Questionable Character of the Bar's Character and Fitness Inquiry*, 40 L. & Soc. Inquiry 51, 52 (2015).

[53] *See, e.g.*, Rhode, *supra* note 10, at 509 (identifying the essential question for evaluating the character and fitness process as the effectiveness of the current system at actually identifying and excluding individuals who are likely to engage in future misconduct); *see also* NCBE Guide *supra* note 16, at vii ("The primary purpose of character and fitness screening before admission to the bar is the protection of the public and the system of justice.").

[54] *See, e.g.*, Tenn. Sup. Ct. R.8, RPC 8.1 ("An applicant for admission to the bar . . . shall not: (a) knowingly make a false statement of material fact; or (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority . . .").

[55] Hudson, *supra* note 6.

[56] *See id.*; *see, e.g.*, *In re* Worthy, 991 N.E.2d 1131 (Ohio 2013); *In re* Wagner 893 N.E.2d 499 (Ohio 2008); *In re* Laughlin 922 So. 2d 475 (La. 2006).

[57] *See, e.g.*, *In re* Payne, 715 S.E.2d 139 (Ga. 2011).

the conduct justifies denying admission.[58] Specifically, NCBE directs the states that:

> the following factors should be considered in assigning weight and significance to prior conduct:
>
> - the applicant's age at the time of the conduct
> - the recency of the conduct
> - the reliability of the information concerning the conduct
> - the seriousness of the conduct
> - the cumulative effect of conduct or information
> - the evidence of rehabilitation
> - the applicant's positive social contributions since the conduct
> - the applicant's candor in the admissions process
> - the materiality of any omissions or misrepresentations.[59]

In practice, this means some bar applicants face insurmountable hurdles, and many others face multiple (and time-consuming) layers of review beyond the initial written character and fitness application, including individual interviews with character and fitness committee members, the possibility of one or more hearings before a committee or the full Board of Bar Examiners in their state, and then the possibility of needing to appeal the Board's decision to the state supreme court to seek admission.[60] As explained in more detail below, individuals with criminal convictions (particularly felonies) and academic misconduct charges (particularly during law school) may face the most difficult hurdle during the character screening process.[61] In fact, a few states have rules that provide a significant barrier or a complete bar to admission for those applicants with a felony conviction.[62] However, all "red-flagged" applicants receive some form of correspondence from their state bar examiners, often in the form of a letter informing them

---

[58] NCBE GUIDE, *supra* note 16, at ix.

[59] *Id.*

[60] *See, e.g.*, MD R. ATTORNEYS, RULE 19-103; *id.* at 19-204 (explaining Maryland's multi-layer system of character and fitness review for bar applicants).

[61] *See generally* Anthony J. Graniere & Hilary McHugh, *Are You in or Are You Out? The Effect of a Prior Criminal Conviction on Bar Admission & A Proposed National Uniform Standard*, 26 HOFSTRA LAB. & EMP. L.J. 223 (2008) (explaining the high bar individuals with criminal convictions face); Sydney Wright-Schaner, *The Immoral Character of "Good Moral Character"—The Discriminatory Potential of the Bar's Character and Fitness Determination in Jurisdictions Employing Categorical Rules Preventing or Impeding Former Felons from Being Barred*, 29 GEO. J. LEGAL ETHICS 1427, 1430 (2016) (explaining the difficulty former felons face in the character and fitness process).

[62] *See, e.g.*, IND. ADMISSION & DISCIPLINE R. 12(2) ("Anyone who has been convicted of a felony *prima facie* shall be deemed lacking the requisite of good moral character as defined in this section.") (emphasis added).

they have a show-cause hearing to address the Board of Law Examiners' concerns about their character and fitness.[63]

Keep in mind that bar applicants have the burden of showing by clear and convincing evidence that they possess the requisite degree of character and fitness.[64] As some critics have noted, this is a more burdensome standard than practicing attorneys who are charged with violations of professional conduct rules and are facing discipline or disbarment, since practicing attorneys do not bear the burden of proving their good character.[65] Additionally, while states often frame the obligation as a requirement for applicants to prove—by clear and convincing evidence—good moral character, including honesty and trustworthiness, the focus of the inquiry in practice is often on requiring applicants to explain prior misconduct rather than offer evidence of good conduct.[66] And, in at least some states, any questions of fitness are resolved against the applicant in favor of protecting the public.[67]

As part of its annual report, NCBE also provides data collected from each state about its requirements for bar admission. Relevant to this analysis of character and fitness requirements, NCBE reported for 2021 the following data:

- Eleven states report that they do not currently have published standards for character and fitness, despite requiring applicants to affirmatively prove that they have the requisite moral fitness to practice law.

- Eleven states also currently require applicants to be approved for admission based on character and fitness prior to being allowed to take the state's bar exam.

---

[63] Hudson, *supra* note 6.

[64] *See, e.g.*, OHIO GOV. BAR R. 1(11)(D)(1) (placing burden on applicant to prove good moral character by clear and convincing evidence); *see also* R.I. SUP. CT. R. Art. II, R. 4 (placing burden on applicant and requiring clear and convincing evidence).

[65] Rhode, *supra* note 10, at 547 (noting apparent double standard between applicants and practicing attorneys and the fact that "both substantive and procedural requirements are more solicitous of practitioners than applicants").

[66] *See* Swisher, *supra* note 38, at 1043–44 (explaining that "'good' moral character means the absence of proven 'misconduct'" and "the inquiry almost exclusively looks at past [bad] acts").

[67] *See, e.g.*, *In re* Admission to the Bar, 828 N.E.2d 484, 489 (Mass. 2005) (citing *In re* Prager, 661 N.E.2d 84, 100 (Mass. 1996), quoting *In Re* Jaffee, 874 P.2d 1299, 1302 (Or. 1994)).

- Twenty-three states have a process for conditional admission for some categories of individuals whose applications raise concerns about character and fitness based on things such as past substance abuse, criminal history, mental health concerns, or debt.[68]

The cases where courts have decided whether a bar applicant meets the character and fitness requirements for bar admission help illustrate the real-world implications of the current system.[69] However, as many scholars have noted, the cases reviewed by courts are only a subset of the potential applicants impacted by character and fitness rules.[70] Many persons likely avoid even applying to law school or for bar admission based on personal histories.[71] Other applicants are flagged for additional investigation but granted certification without needing to resort to court appeal.[72] Still, others are denied certification by state Character and Fitness Committees or by a state Board of Bar Examiners without the ability or inclination to appeal that decision in court.[73] Therefore, while it is generally accepted that a small percentage of applicants are actually denied admission on character and fitness grounds, the impact of employing this "moral" barrier to entry is greater than reflected in these numbers.[74]

## B. Common Factors for Denial of Character Certification

As noted previously, honest and complete disclosure in response to all character and fitness questions (despite the extensive and intrusive inquiries)

---

[68] *Chart 2: Character and Fitness Requirements*, COMPREHENSIVE GUIDE TO BAR ADMISSION REQUIREMENTS, https://reports.ncbex.org/comp-guide/charts/chart-2/ [https://perma.cc/5EFE-VFJ6].

[69] *See* Hadar Aviram, *Moral Character: Making Sense of the Experiences of Bar Applicants with Criminal Records*, 43 MAN. L.J. 1, 18 (2019); *see also* Tarra Simmons, *Transcending the Stigma of a Criminal Record: A Proposal to Reform State Bar Character and Fitness Evaluations*, 128 YALE L.J. FORUM 759, 767 (2019).

[70] *See* Rhode, *supra* note 10, at 517 (noting deterrent effect of character requirements on both law school applicants and those who withdraw bar applications in the face of character challenges).

[71] Leslie Levin, *The Folly of Expecting Evil: Reconsidering the Bar's Character and Fitness Requirement*, 2014 BYU L. REV. 775, 777 (2014); *see also* Allyson McCain, *The Moral Character Evaluation: Proving That Your Past Does Not Define Your Future*, 61 GOLDEN GATE U. L. REV. BLOG (Apr. 21, 2019), https://ggulawreview.com/2019/04/21/the-moral-character-evaluation-proving-that-your-past-does-not-define-your-future/ [https://perma.cc/345X-4G9W] (noting the example of Bruce Reilly, who was previously convicted of second degree murder, graduated from law school in 2014 and has decided not to attempt bar admission based on past conviction).

[72] Rhode, *supra* note 10, at 516.

[73] Levin, *supra* note 71, at 783–84.

[74] Rhode, *supra* note 10, at 493–94.

is key to success.[75] One of the primary reasons cited by courts across the country for denying bar admission on character and fitness grounds is lack of candor.[76] Since proving good moral character is broadly tied to evidence of honesty and trustworthiness, the prominent role of lack of candor to justify denying admission appears consistent.[77] This lack of candor, however, appears to take many forms including: lack of full disclosure of past conduct on law school or bar applications, inconsistent or insufficient explanations for areas of concern identified by bar committees during their investigation, and failing to demonstrate sufficient appreciation for the seriousness of the underlying misconduct.[78] Lack of candor appears to be a catchall category for applicants who a board or court decided not to admit.[79] Even when Boards do not cite lack of candor as the primary reason for denying admission, it is regularly included as an additional justification along with other identified concerns to further support denying admission.[80]

Another broad (and sometimes vague) reason for exclusion is "willful disrespect for the law."[81] Like lack of candor, this justification for denying certification appears consistent with a fitness standard for individuals who will become officers of the court, but is also inconsistently interpreted and applied, and can take many forms.[82] At its core, disrespect for the law is the reason offered for excluding individuals with some kind of criminal history.[83] It may also be the reason offered for denying admission to individuals who have demonstrated disrespect for court orders or for individuals who participate in protests or otherwise challenge governmental or judicial authority more generally.[84] However, it has also been raised as a justification for denying character certification for immigrants who lack official

---

[75] Hudson, *supra* note 6.

[76] Megan E. Davis, *Attorney Loses License for Lack of Candor in Application Process*, FLA. BAR NEWS (July 1, 2013), https://www.floridabar.org/the-florida-bar-news/attorney-loses-license-for-lack-of-candor-in-application-process/ [https://perma.cc/BS7K-K7PM].

[77] Hudson, *supra* note 6.

[78] *See e.g., In re* Application of Brumbaugh, 2021 WL 983255 (Ohio 2021); *In re* Grundstein, 183 A.3d 574 (Vt. 2018); *In re* Huddleston, 777 S.E.2d 438 (Ga. 2015); *Matter of* Knight, 211 A.3d 265 (Ct. App. Md. 2019); *In re* Phillips, 175 A.3d 824 (Ct. App. Md. 2017).

[79] Memorandum from Bedford T. Bentley, Jr., Sec'y Md. State Bd. of Law Exam'rs to First Year Law Students (May 18, 2009), http://law.ubalt.edu/downloads/law_downloads/admiss_msbe_bar_letter.pdf [https://perma.cc/FQ5E-N7VQ].

[80] *See, e.g., In re* Overall, 175 A.3d 666 (Md. 2017); Fla. Bd. of Bar Exam'rs re R.B.R., 609 So. 2d 1302 (Fla. 1992).

[81] *In re* Admission to the Bar, 729 N.E.2d 1085, 1088 (Mass. 2000).

[82] *See* Rhode, *supra* note 10, at 538.

[83] *See id.* at 537.

[84] *See id.* at 567; *see also, e.g., In re* Anderson (Office of Attorney Licensing), 249 A.3d 305 (Vt. 2020); *In re* Comm. on Bar Admissions CFN-461218, 221 So.3d 835 (La. 2017) (denying application based on disreard for court orders); *In re* Chalupowski, 41 N.E.3d 51 (Ma. 2015).

documentation.[85]

Another related category for denying character and fitness certification, which may be a combination of the prior two categories, is a lack of respect for the character review process itself. Individuals whose admission is denied on these grounds are viewed by the review committee, board, or court as failing to take the character and fitness review process seriously, being uncooperative or evasive in response to committee requests, or even being actively hostile to committee members during review hearings.[86]

Another justification cited for denying admission is financial irresponsibility, which also may be a variation of disrespect for the law and the rights of others.[87] This may encompass individuals with significant student loan debt, especially when those loans are in default and the individual has not taken steps for responsible repayment.[88] It can also include individuals who have failed to pay their state or federal income taxes, and individuals who otherwise have unsatisfied judgments against them.[89] Sometimes it involves individuals who have filed bankruptcy, but only if the reason for the filing is viewed as irresponsible or an attempt to avoid legal obligations.[90]

Given the expansiveness of the character and fitness inquiry, the very real and significant impact it has on an individual's decisions to attend law school and ultimately to be able to work in their selected field, and the varied factors that can lead to a denial of bar admission, many critics have raised concerns about the current process and suggested improvements in the process to eliminate unintended consequences and more efficiently and

---

[85] *See, e.g., In re* Garcia, 315 P.3d 117 (Cal. 2014) (granting admission to an undocumented immigrant and addressing arguments of amici that status as an undocumented immigrant demonstrates a current violation of law); *see also* Paulo Edmundo Ochoa, *Education Without Documentation: As Plyler Students Reach New Heights, Will Their Status Make Them Morally Unfit to Practice Law?*, 34 T. JEFFERSON L. REV. 411 (2012).

[86] *See, e.g., In re* A.S., 173 A.3d 1280 (R.I. 2017) (denying admission for displaying hostility to committee and resisting requests for information during review process).

[87] *See, e.g., In re* Mikulin, 49 N.E.3d 287 (Ohio 2016) (noting financial irresponsibility demonstrated lack of respect for law); *In re* T.Z.-A.O., 105 A.3d 492 (Md. 2014); Artem M. Joukov & Samantha M. Caspar, *Who Watches the Watchmen? Character and Fitness Panels and the Onerous Demands Imposed on Bar Applicants*, 50 N.M. L. REV. 383, 393–95 (2020).

[88] *In re* Griffin, 943 N.E.2d 1008 (Ohio 2011) (denying admission based on significant student loan debt and lack of plan for repayment); *see also* Kaela Raedel Munster, *A Double-Edged Sword: Student Loan Debt Provides Access to a Law Degree But May Ultimately Deny a Bar License*, 40 J. Coll. & U. L. 285 (2014).

[89] Fla. Bd. of Bar Exam'rs re B.U.U., 124 So. 3d 172 (Fla. 2013) (denying admission to applicant who failed to pay state or federal income taxes or to keep up with payment plans and noting that Florida attorneys had been disbarred for similar conduct).

[90] *See, e.g., In re* Steffen, 261 P.3d 1254 (Or. 2011) (noting that filing for bankruptcy is not a hurdle to admission but that it was appropriate for the committee to investigate the circumstances of the bankruptcy because, when used to escape irresponsible financial behavior and mismanagement, it can be an appropriate factor in determining fitness).

effectively serve its intended purposes.[91]

## IV.   CRITICISMS OF THE CHARACTER AND FITNESS PROCESS

Many criticisms surrounding the character and fitness process are longstanding.[92] The criticisms fall into several broad categories but include variation and nuance as well. At the broadest level, critics question whether the character and fitness system effectively serves its intended purpose.[93] Specific criticisms include concerns that: (A) past conduct is a poor predictor of future behavior; (B) the lack of clear rules and inconsistent enforcement make the process too subjective and unpredictable; (C) creating insurmountable hurdles for individuals with prior criminal involvement is inconsistent with a justice system that claims to favor rehabilitation; (D) the current process is discriminatory with unintended consequences for individuals of color, individuals with disabilities, and possibly individuals of lower socioeconomic status as well; (E) the cost of implementing the character and fitness assessment is an unreasonable burden in terms of time and money that could be more effectively focused elsewhere; and (F) the current system for assessing character and fitness continues to raise constitutional concerns.[94]

### A.   Ineffective Proxy for Intended Purpose

A chief criticism of the character and fitness process is that there is little evidence the character and fitness process actually protects the public by removing those individuals from consideration that would be the most problematic as lawyers.[95] Ethics expert Leslie Levin wrote that "[t]here are enough questions about the value of the character and fitness inquiry to merit reconsidering the wisdom of continuing the inquiry as currently constituted."[96] Levin identified specific concerns about the questions asked as part of the character and fitness inquiry, noting that "[t]he questions are not derived from—nor have they ever been validated using—psychological assessment tools and it is unclear what they actually measure."[97] She acknowledged that it is "unlikely that any profession or regulatory body would license individuals who, at the time of application, are incarcerated

---

[91] See, e.g., Rhode, supra note 10; Levin, supra note 71.

[92] See, e.g., Rhode, supra note 10 (identifying many of the criticisms of the character and fitness process still asserted today including: lack of clear definition, inconsistent enforcement, arbitrariness, lack of connection between prior conduct and future behavior, unfair impact of individuals with prior justice involvement, constitutional concerns, and the inefficiency and costs of the system).

[93] See id.

[94] See id.

[95] See generally Levin, supra note 71.

[96] Id. at 798.

[97] Levin et al., supra note 52, at 52.

for serious crimes or hospitalized for incapacitating psychological disorders," but she added that based on the lack of evidence of the predictive value of prior conduct on future action that "the current character inquiry appears to be an ineffective method of determining who *else* should be denied admission to the bar."[98]

Similarly, more than thirty-five years ago, Rhode identified that "[t]he critical empirical question" for evaluating the character and fitness process is to determine "the effectiveness of current procedures in identifying those likely to engage in future misconduct."[99] The answers that emerged in the intervening years are that it is not very effective at all. In fact, social science research consistently has shown that past conduct alone is not a good predictor of future behavior.[100] For example, research has shown that conduct is strongly influenced by situational factors and that character is not static.[101] Therefore, a system based primarily on a review of applicant's prior conduct, especially conduct lacking temporal proximity, is unlikely to further the intended purposes of protecting the public or protecting the judicial system because it is likely to be both under- and over-inclusive, screening out those who are unlikely to violate public trust, while admitting many who will. Rhode also noted that for many applicants, the character inquiry comes too soon, before they are faced with the stresses and challenges of legal practice (i.e., the situational factors) that are more likely connected to future conduct.[102]

**B.** *Inherent Subjectivity, Implicit Bias, Arbitrary Application & Resulting Lack of Predictability*

Another essential flaw with the process for evaluating character and fitness for admission to the bar that is repeatedly highlighted by critics is the simple fact that there is no one agreed upon definition of "good moral

---

[98] Levin, *supra* note 71, at 804.

[99] Rhode, *supra* note 10, at 509.

[100] Levin, *supra* note 71, at 775.

[101] Deborah Rhode, *Virtue and the Law: The Good Moral Character Requirement in Occupational Licensing, Bar Regulation, and Immigration Proceedings*, 43 L. & SOC. INQUIRY 1027, 1028 (2018); *see also* W. Bradley Wendel, *Stephen Glass, Situational Forces, and the Fundamental Attribution Error*, 4 J. L. PERIODICAL LAB'Y OF LEGAL SCHOLARSHIP 99 (2014) (adding to the understanding of the implications of psychological research the concerns about fundamental attribution error, which is that people tend to attribute wrongdoing to character flaws without consideration of situational forces).

[102] Rhode, *supra* note 10, at 515–17.

character."[103] The term itself is vague.[104] In fact, in one of the few character and fitness challenges to reach the Supreme Court, Justice Hugo Black warned that the term "good moral character" was vague and could lead to problems:

> [T]he term, by itself, is unusually ambiguous. It can be defined in an almost unlimited number of ways for any definition will necessarily reflect the attitudes, experiences, and prejudices of the definer. Such a vague qualification, which is easily adapted to fit personal views and predilections, can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law.[105]

While some states do attempt to define the term "good moral character," the definitions shed little light on the actual conduct that meets the standard or raises concerns, and several states still lack any written policies regarding good moral character despite requiring applicants to demonstrate it for bar admission.[106]

As a result of vague definitions and lack of clear rules, attempts to define "good moral character" necessarily draw on the subjective beliefs of examiners applying the standard and incorporating their implicit biases.[107] The inherent subjectivity leads to inconsistent and arguably palpably unfair results.[108]

The lack of consistency results in uneven application and enforcement.[109] Even the most cursory review of the case law illustrates the fact that apparently similar cases are not treated similarly in the context of evaluating character, either across or even within jurisdictions.[110] In a more

---

[103] *See, e.g.,* Marcus Ratcliff, *The Good Character Requirement: A Proposal for a Uniform National Standard*, 36 TULSA L.J. 487, 488 (2000) ("Unlike an absolute that may be found in science, the concept of character has no universally accepted definition; thus, a major problem arises. Ambiguous notions of good character coupled with vague tests for judging an applicant's character, have resulted in inconsistent results in bar admission cases.").

[104] *Id.* at 488–89 (attempting to define the requirement as "possess[ing] the character needed to successfully and ethically practice law").

[105] Konigsberg v. State Bar of Cal., 353 U.S. 252, 263 (1957).

[106] *See supra* text accompanying note 68.

[107] Michael C. Wallace, Sr., *Moral Character and Fitness Means More Than Just a Passing Score to the Board of Law Examiners*, 7 CHARLOTTE L. REV. 157, 161 (2016).

[108] *See, e.g., In the Matter of Nash*, 257 P.3d 130 (Alaska 2011) (noting applicant had been previously admitted in Iowa and expressing concern of potential bias at board hearing level where admission was denied); *see also In re* Burke, 775 S.E.2d 815 (NC 2015) (noting applicant was previously admitted in D.C. but was denied admission in N.C.)

[109] *See* Swisher, *supra* note 38.

[110] *Compare In re* Phelps, 878 N.E.2d 1037 (Ohio 2007) (applicant denied admission in part because of two prior DUI arrests), *with In re* Beers, 118 P.3d 784 (Or. 2005) (applicant admitted despite criminal history including drug conviction); *compare In re* Wiesner, 94

recent article, Rhode criticizes the striking variation between states regarding the type of conduct that may result in denial of bar admission on character and fitness grounds.[111] She even provides stark examples of apparently inconsistent application where individuals with prior misconduct appearing minor on its face, such as criminal charges related to violating state fishing license laws, are denied admission, while those with more serious criminal conduct, such as child molestation, are admitted.[112] However, Rhode also acknowledges that "[o]ne fundamental challenge in crafting a reform agenda is how to balance competing values: consistent treatment of similar conduct, and individualized consideration of all the situational factors that affect conduct and influence our character judgments."[113]

### C.   Potentially Insurmountable Hurdle for Individuals with Prior Criminal Convictions

Beyond the general lack of clarity and inherent arbitrariness and bias, some critics believe the process is too unforgiving of those who have a felony on their record. One commentator explains it is a "herculean feat" for someone with a felony conviction to become a lawyer.[114]

While only three states (Kansas, Mississippi, and Texas) reported to NCBE in 2021 that felony convictions are an express bar to admission, in several other states, a felony conviction effectively bars admission for an extended time.[115] In Montana, for example, applicants with felony convictions are ineligible for admission until completion of their sentence or probation.[116] In Missouri, that period of inadmissibility extends for an additional five years after completion of their sentence or probation.[117] In Oregon, such applicants are ineligible indefinitely if the conviction would have led to disbarment for an individual who had been a practicing attorney at the time.[118]

In fact, in NCBE's 2021 Comprehensive Guide to Bar Admission Requirements ("NCBE Guide"), many state respondents elaborated on their claim that felony convictions are not an express bar to entry with supplemental remarks explaining that felony convictions do set a higher bar by creating a rebuttable presumption of lack of good moral character, trigger additional requirements for admission such as restoration of civil rights, or,

---

A.D.3d 167 (N.Y. 2012) (attorney readmitted to bar despite serious criminal history), *with In re* Prager, 661 N.E.2d 84 (Mass. 1996) (applicant denied admission because of criminal history years earlier).

[111] Rhode, *supra* note 10, at 1034.

[112] *Id.*

[113] *Id.* at 1046.

[114] Wright-Schaner, *supra* note 61, at 1430.

[115] *See* NCBE GUIDE, *supra* note 16, at 6–7.

[116] *Id.*

[117] *Id.*

[118] *Id.*

at a minimum, require formal hearings prior to admission.[119] While not included in the NCBE Guide, according to the Ohio Supreme Court, Ohio law prohibits the Board of Commissioners on Character and Fitness from approving the character and fitness of an applicant who has been convicted of a felony until after the applicant is released from "parole, probation, community control, post-release control, or prison."[120] Ohio's heightened scrutiny also is triggered for individuals adjudicated delinquent as minors for conduct that would have been a felony if committed by an adult.[121] In fact, Ohio is one state that requires applicants to disclose all juvenile offenses, even if expunged from their record.[122]

Beyond these express requirements, the hurdles for previously justice-involved individuals are significantly higher than other applicants in all states.[123] One of the largest practical hurdles beyond the heightened scrutiny and time-consuming formal hearings is the express obligation for applicants with a criminal history to prove rehabilitation as a condition of admission.[124] As with other criteria, required evidence of rehabilitation varies greatly across jurisdictions.[125] However, it generally requires more than just proof that the individual has not committed any additional criminal acts (including sometimes even traffic offenses).[126] Instead, applicants have the burden to offer sufficient evidence that they made amends for their prior misconduct by giving back to the community and developing a consistent reputation for

---

[119] *Id.*

[120] OHIO GOV. BAR R. I(13)(D)(5)(a)(i).

[121] *See, e.g., In re* Morris, 175 N.E.3d 481 (Ohio 2021) (citing OHIO GOV. BAR R. I(13)(D)(5)(a) and I(14) requiring review by Board of Commissioners on Character and Fitness despite recommendation of admissions committee that the applicant satisfied requirements for character and fitness).

[122] OHIO GOV. BAR R. I(13)(D)(1) (noting that failure to provide requested information including information about "expungements and juvenile court proceedings" is grounds to disapprove application).

[123] *See* Simmons, *supra* note 69, at 760 n.7 (elaborating on "formerly justice-involved individuals").

[124] *See, e.g., In re* Anonymous, 116 A.D.3d 62, 74 (N.Y. 2014) (holding that the test was "whether his post-conviction life has been so exemplary as to make amends for his crimes" with a higher bar for more severe crimes and that despite evidence that the applicant had lived a commendable life since being released from prison, including several positive character references from prominent individuals, his evidence lacked the "extraordinary achievements" that they were looking for given his past record).

[125] *Compare In re* Anonymous, 116 A.D.3d, *with In re* Wiesner, 94 A.D.3d 167 (N.Y. 2012) (holding that the applicant has finally proven sufficient rehabilitation on tenth application to the New York bar after being admitted and successfully practicing in several other jurisdictions). *See* Maureen M. Carr, *The Effect of Prior Criminal Conduct on the Admission to Practice Law: The Move to More Flexible Admission Standards*, 8 GEO. J. LEGAL ETHICS 367, 386 (1995) (explaining survey results to states about impact of criminal convictions and evidence of rehabilitation on bar admission).

[126] *See, e.g., In re* Payne, 715 S.E.2d 139 (Ga. 2011) (holding that applicant with criminal conviction must prove "complete rehabilitation," which requires more than just being a functioning member of society who is married, holding a job, and supporting a family).

honesty and integrity, which is established by offering multiple exemplary character references from respected witnesses in the local legal community.[127] However, some courts, even when presented with multiple glowing references and evidence of significant pro bono work, find that the applicant's rehabilitation is still insufficient given the seriousness of their prior conduct.[128] Other courts have even expressly acknowledged that for some applicants, despite turning their life around after being released from prison, the barrier to admission is insurmountable.[129]

Tarra Simmons's admission to the bar by the Washington Supreme Court in 2018 after being denied character and fitness certification by the state Board of Bar Examiners is an often cited example of the failure of the current system with regard to individuals with prior criminal convictions.[130] Simmons had a long history of substance abuse, two criminal convictions, and two bankruptcies.[131] After she was released from prison, however, Simmons, by all accounts, turned her life around; she became the first in her family to attend college, then graduated from law school at the top of her class with a Skadden Fellowship.[132] Despite numerous glowing recommendations, six years of sobriety, no further criminal involvement, and significant community service, the Washington Board of Bar Examiners denied her application on character and fitness grounds.[133] Fortunately, the supreme court reversed this decision, and Simmons is practicing law, advocating for the rights of previously incarcerated individuals and bringing a unique perspective to the bar, which critics of the character review process view as beneficial to clients and the legal profession.[134]

In her own words, Simmons explained the board denied her application for two reasons:

> First, the majority of the Board concluded that my six years of

---

[127] *See generally* Simmons, *supra* note 69; *see, e.g., In re* Stephen Randall Glass on Admission, 316 P.3d 1199 (Cal. 2014) (denying admission because applicant failed to demonstrate he made amends for prior conduct by giving back to community or otherwise demonstrating exemplary conduct).

[128] *See, e.g., In re* Dortch, 860 A.2d 346 (D.C. 2004) (noting that despite an "impressive array of strong character references," the applicant was denied due to the seriousness of his underlying felony conviction for murder).

[129] *In re* Matthews, 462 A.2d 165, 172 (N.J. 1983) ("[I]n the case of extremely damning past misconduct, a showing of rehabilitation may be virtually impossible to make.").

[130] *In re* Simmons, 414 P.3d 1111 (Wash. 2018); *see also* Jennifer Aronson, Comment, *Rules Versus Standards: A Moral Inquiry into Washington's Character & Fitness Hearing Process*, 95 WASH. L. REV. 997 (2020) (using Simmons's case as her opening example of the problems with the character and fitness process for formerly justice involved individuals); McCain, *supra* note 70.

[131] *Simmons*, 414 P.3d at 1112.

[132] *Id.* at 1113.

[133] *Id.* at 1113–14.

[134] *Id.*

rehabilitative efforts were not enough; rather, my efforts were "tender," "still fragile," and "still in their infancy." Second, the Board concluded that I possessed an attitude displaying "a sense of entitlement to privileges and recognition beyond the reach of others" based on my advocacy for admission and the public recognition I had received because of some of my accomplishments.[133]

In other words, they did not like her attitude. As noted by the court, the board denied her admission to the bar in part because they decided she had not displayed sufficient remorse for her prior conduct.[136]

Simmons's experience thereby exemplifies one scholarly concern that bar applicants with prior criminal involvement, in addition to clearing higher hurdles for admission, also apparently need to sufficiently "perform" genuine remorse in order to convince board members that they are worthy of admission.[137] Based on interviews with formerly justice-involved individuals as well as individuals who evaluate bar applications for character and fitness, this commentator explained the fine line applicants felt required to walk between admitting guilt, explaining their prior conduct, and demonstrating sufficient rehabilitation—all without being perceived as deflecting responsibility or minimizing prior bad actions.[138] Even for those individuals who were ultimately admitted to practice, they experienced the process as being one of the worst in their lives.[139] The author also noted that the social science research shows an inability of others to accurately judge remorse (despite their own overestimations of their abilities).[140] When combined with cultural differences in the way individuals express remorse, this raises concerns that the current system is both inherently ineffective and potentially discriminatory.[141]

There are many other examples of exceptional attorneys who overcame felony convictions and are practicing law. Perhaps the most notable example in recent years is the celebrated case of Shon Hopwood (Simmons's attorney for her appeal before the Washington Supreme Court), who was convicted of robbing several banks and now teaches law at Georgetown University.[142] Another example is Nashville-based criminal

---

[133] Simmons, *supra* note 69, at 767–68.
[136] *See id.*
[137] Aviram, *supra* note 69, at 18.
[138] *See id.* at 15 ("The most important service we offer people is framing. It's a delicate balance between explaining what happened to you in context and being seen as if you're deflecting blame for what you've done.").
[139] *Id.*
[140] *Id.* at 29.
[141] *Id.*
[142] Steve Kroft, *Meet a Convicted Felon Who Became a Georgetown Law Professor*, CBS NEWS (July 21, 2019), https://www.cbsnews.com/news/60-minutes-meet-a-convicted-felon-

defense attorney Keeda Haynes, who spent a few years in federal prison as a young woman and now is not only an efficacious criminal defense attorney but a noted public speaker at law conferences across the country.[143]

### D. Continued Discriminatory Effects

#### 1. Unintended Consequence of Discouraging Applicants of Color and Magnifying the Effects of a Discriminatory Criminal Justice System

Another criticism is that the process still is potentially discriminatory. While the process today is handled by professionals who do not engage in rank discrimination, one commentator warns that this process may have a "racially discriminatory impact" on African American applicants given iniquities in the criminal justice system.[144]

Much has been written about race discrimination in the criminal justice system in terms of arrests, prosecutions, and sentencing.[145] When combined with the sometimes insurmountable hurdle for bar applicants with prior criminal justice involvement, the attorney licensing system effectively magnifies this discrimination. Critics note that, in light of this connection, it is maybe not surprising that there is a concerning lack of diversity in law schools and among practicing lawyers.[146] As mentioned previously, part of the concern with the current system is that the relatively small number of applicants denied admission on character and fitness grounds is an underrepresentation of the true impact. Therefore, critics have explained that the current system has the unintended effects of discouraging applicants

---

who-became-a-georgetown-law-professor-shon-hopwood-2019-07-21/ [https://perma.cc/FD2A-2D2T]; Susan Svrluga, *He Robbed Banks and Went to Prison. His Time There Put Him on Track for a New Job: Georgetown Law Professor*, WASH. POST (Apr. 21, 2017), https://www.washingtonpost.com/news/grade-point/wp/2017/04/21/bank-robber-turned-georgetown-law-professor-is-just-getting-started-on-his-goals/ [https://perma.cc/NH35-7444].

[143] KEEDA HAYNES, BENDING THE ARC: MY JOURNEY FROM PRISON TO POLITICS (2021); Steven Hale, *Keeda Haynes Brings Something Different to the Public Defender's Office — Five Years Spent in Prison*, NASHVILLE SCENE, (Aug. 18, 2016), https://www.nashvillescene.com/news/coverstory/keeda-haynes-brings-something-different-to-the-public-defender-s-office-five-years-spent-in/article_caa8c851-e0ae-53d2-8e11-328f41fcd54d.html [https://perma.cc/C6ED-66QZ]; *A Tale of Two Inmates: The Human Toll of Incarceration*, CATO INST. (Mar./Apr. 2017), https://www.cato.org/policy-report/march/april-2017/tale-two-inmates-human-toll-incarceration [https://perma.cc/42NJ-WBSN?type=image].

[144] Wright-Schaner, *supra* note 61, at 1437.

[145] *See, e.g.*, MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION THE AGE OF COLORBLINDNESS (1st ed. 2010).

[146] Jay E. Mitchell, *Character and Fitness: The Underrepresentation of Black Men in Law*, A.B.A. (Mar. 8, 2017), https://www.americanbar.org/groups/litigation/committees/2017/winter2017-character-and-fitness-the-underrepresentation-of-black-men-in-law/ [https://perma.cc/6YGZ-AG39].

of color from even seeking admission, and those who do seek admission may be denied or delayed, thereby continuing the cycle of underrepresentation of individuals of color in the bar.[147]

2.   *ADA Violations & Consequences for Applicants Seeking Needed Mental Health and Substance Abuse Treatment*

Another criticism focuses on asking applicants about their mental health.[148] Mandatory mental health queries can raise concerns under the Americans with Disabilities Act of 1990 ("ADA"), as well as raising concerns about law student well-being and the likely effect of discouraging some individuals from seeking needed mental health support based on a fear that it may impact their ability to be admitted to the bar.[149]

The ADA is the federal law that protects individuals with disabilities from discrimination by seeking to ensure equal access to jobs, programs, and services.[150] In particular, Title II of the ADA ("Title II") prohibits public entities from excluding eligible individuals with disabilities from its programs and services.[151] As authorized by Congress, the U.S. Department of Justice ("DOJ") develops and enforces regulations to implement the protections guaranteed by the ADA.[152] Accordingly, state courts, boards of bar examiners, and character and fitness committees are considered "public entities" subject to the requirements of Title II.[153] And professional licensing is considered a benefit to which individuals cannot be excluded based solely on their status as an individual with a disability or based on stereotypes about

---

[147] *Id.* (noting that the deterrent imposed by the character and fitness requirement is particularly pronounced when it comes to black men).

[148] David Jaffe & Janet Stearns, *Conduct Yourselves Accordingly: Amending Bar Character and Fitness Questions to Promote Lawyer Well-Being*, A.B.A. (Jan. 22, 2020), https://www.americanbar.org/groups/professional_responsibility/publications/professional_lawyer/26/2/conduct-yourselves-accordingly-amending-bar-character-and-fitness-questions-promote-lawyer-wellbeing/ [https://perma.cc/7DUE-2AC7].

[149] *Id.*

[150] *See* Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101–12213 [hereinafter ADA].

[151] 42 U.S.C. §12132 ("[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.").

[152] 42 U.S.C. §12134(a); 28 C.F.R. § 35.101 (2016).

[153] *See Department of Justice Reaches Agreement with Louisiana Supreme Court to Protect Bar Candidates with Disabilities*, U.S. DEP'T OF JUST. (Aug. 15, 2014), https://www.justice.gov/opa/pr/department-justice-reaches-agreement-louisiana-supreme-court-protect-bar-candidates [https://perma.cc/57T7-A2J8] (defining the Louisiana court, committee on bar admissions and disciplinary board as public entities for purposes of the ADA) [hereinafter Press Release No. 14–860].

their abilities.[154] Therefore, state courts and bar examining authorities must comply with the ADA when developing and implementing rules for character and fitness assessments and certification.

In 2011, the DOJ began investigating the attorney licensing process in Louisiana, focusing on whether the state's character and fitness inquiry, related investigations, and resulting conditional admission violated the ADA.[155] At the time of the DOJ investigation, Louisiana used the NCBE character and fitness application, including three questions about mental health.[156] Specifically, as part of the mandatory application, candidates were required to answer questions about whether they had been diagnosed with specific mental health conditions.[157] They were also asked whether they had a mental or emotional condition that "in any way currently affects, or if untreated could affect [their] ability to practice law . . ." and whether they are receiving treatment for this condition.[158] Finally, they were asked whether they had ever raised their mental health condition as an explanation for their actions.[159] If an applicant responded affirmatively to any of these questions, their application was flagged for additional investigation, and they were required to provide the bar committee with detailed medical records (including treatment notes) and broad releases to allow investigators to talk to their treating providers.[160]

In its 2014 Letter of Finding ("LOF"), the DOJ determined these questions were unnecessarily intrusive and violated the ADA.[161] Specifically, it found that by asking questions about whether an individual had a mental health diagnosis or had received mental health treatment, the court and board were effectively treating individuals differently based solely on their status as an individual with a disability, rather than appropriately considering conduct relevant to their ability to practice law regardless of disability status.[162] At the same time, NCBE revised the challenged questions to address the concerns raised by the DOJ.[163] As part of its settlement

---

[154] 28 C.F.R. § 35.130(b)(6) (prohibiting public entities from "administer[ing] a licensing or certification program in a manner that subjects qualified individuals with disabilities to discrimination . . . .").

[155] Letter from Jocelyn Samuels, Acting Assistant Att'y Gen., U.S. Dep't of Just., C.R. Div., to the Hon. Bernette J. Johnson, C.J., Louisiana Sup. Ct., et al. (Feb. 5, 2014) (on file with the DOJ), https://www.ada.gov/522ouisiana-bar-lof.pdf [https://perma.cc/YEW2-BNRD].

[156] *Id.* at 5.

[157] *Id.*

[158] *Id.*

[159] *Id.*

[160] *Id.* at 6.

[161] *Id.* at 18.

[162] *Id.* at 22–23.

[163] *Id.* at 18; Anna Stolley Persky, *State Bars May Probe Applicants' Behavior, But Not Mental Health Status, Says DOJ*, A.B.A. J. (June 1, 2014), https://www.abajournal.com/magazine/article/state_bars_may_probe_applicants_behavior_

agreement with the DOJ, the Louisiana court agreed to modify its questions as well to focus on conduct rather than diagnosis and treatment.[164]

As part of its investigation, the DOJ also considered the additional burdens placed on individuals who answered any of these questions about the applicant's mental health in the affirmative.[165] In particular, the DOJ expressed concern that these individuals were subjected to additional investigation and then were granted only conditional bar admission with burdensome requirements that violated the applicant's privacy rights in protected medical information and arguably interfered with their ability to practice law.[166] So, while some scholars advocate a move toward an expanded conditional admission process, such a process must be based on an individualized determination of the benefits of permitting conditional admission, rather than a categorical response to individuals who respond affirmatively to questions about mental health.

Even prior to the DOJ's 2014 LOF, DOJ provided advice to the Vermont Bar on a similar issue.[167] Meanwhile, other courts recognized the discriminatory effect of requiring bar applicants to answer questions about their disability status and subjecting such applicants to heightened burdens for admission.[168] This concern is amplified by social science research that finds no connection between mental health diagnosis and ability to practice law.[169]

Since the DOJ's finding, slow progress has been made by states to revise questions regarding mental health diagnoses and treatment, and to decrease or eliminate the overbroad requirements for applicants to provide bar examiners with complete copies of mental health records and blanket releases to seek information directly from treating professionals. According to the ABA Commission on Disability Rights, which compiles a comprehensive list annually of the mental health questions asked by each state as part of its character and fitness evaluation, as of 2020, only eight states completely eliminated all questions regarding mental health diagnosis and treatment.[170] Over half the states continue to either use the revised NCBE questions or adopt similar language for their mental health-

---

but_not_mental_health_status [https://perma.cc/K9AE-733J]; Jaffe & Stearns, *supra* note 148 (noting the 2014 change by NCBE to its mental health questions is response to the Louisiana decree).

[164] Press Release No. 14‑860, *supra* note 153.

[165] Letter from Jocelyn Samuels, *supra* note 155, at 19.

[166] *Id.* at 27.

[167] *See id.* at 36–45.

[168] *See, e.g.*, Clark v. Va. Bd. of Bar Exam'rs, 880 F. Supp. 430 (E.D. Va. 1995).

[169] *See, e.g.*, Lusk *supra* note 33, at 371–72.

[170] *See* A.B.A. COMM'N ON DISABILITY RTS., MENTAL HEALTH PROVISIONS IN STATE BAR EXAMS (2020), https://www.americanbar.org/content/dam/aba/administrative/commission-disability-rights/mh-provisions-state-bar-exams.pdf [https://perma.cc/4RBW-LUWP].

related questions.[171] As of 2020, some states still effectively sought information that the DOJ found violated the ADA, including Florida, Kentucky, Nevada, and Texas, each of which seek information about specific diagnoses.[172] Florida also still expressly requires applicants to allow any treating professional to provide copies to the board of all requested records.[173] A federal district court in Kentucky went out of its way (in a recent decision that had to be dismissed on procedural grounds) to explain that the "bar bureaucracy" in Kentucky likely violated the ADA with its extensive questioning regarding an applicant's bipolar diagnosis, its intrusive medical records requests, and its "994-day" delay in admitting an applicant who successfully practiced in another state for eleven years.[174]

The current NCBE sample character and fitness questionnaire, which was revised in January 2021, continues to seek information regarding mental health conditions and treatment rather than limiting its inquiry to actual conduct.[175] While the NCBE reinserted the preamble language notifying applicants that seeking mental health treatment is not a bar to admission and somewhat revised the language for objectionable mental health questions, Question 30 continues to seek information regarding any "condition or impairment."[176] Specifically, the applicant is required to reveal "any [current] condition or impairment (including, but not limited to, substance abuse, alcohol abuse, or a mental, emotional, or nervous disorder or condition) that in any way affects [their] ability to practice law in a competent, ethical, and professional manner."[177] This question is similarly adopted by many states, including those that do not use NCBE to conduct their initial fitness inquiries.[178]

In addition to being invasive, and arguably discriminatory, such a question is speculative.[179] It asks the applicant to decide whether the bar examiners will view their conditions as likely to impact their legal practice. Moreover, this question sets applicants up for failure based on subsequent accusations of lack of candor for failing to reveal mental health conditions the applicant does not believe would impact their ability to practice law, but that a bar examiner or judge determines should have been disclosed.

Applicants also continue to be asked about the ameliorative effects of any treatment or monitoring and are required to describe the treatment and provide the name of their doctor or counselor. While the DOJ may

---

[171] *See id.* at 3; *see also* Lusk, *supra* note 33, at 370.

[172] *See* A.B.A. COMM'N ON DISABILITY RTS., *supra* note 170, at 3.

[173] *Id.* at 8.

[174] Doe v. Sup. Ct. of Kentucky, 482 F. Supp. 3d 571, 576 (W.D. Ky. 2020).

[175] NAT'L CONF. BAR EXAM'RS, *supra* note 48 (question 30).

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] Jaffe & Stearns, *supra* note 148.

have accepted these (or similar) inquiries as part of its settlement agreement with Louisiana, lessening the concerns of ADA violations, the questions continue to stigmatize mental health and have the potential to discourage applicants from seeking needed treatment.[180] Given the current concerns about law student and lawyer well-being, this continues to raise grave concerns.

Specifically, a 2014 ABA-sponsored survey of law students at fifteen schools found forty-five percent of the law students who reported that they chose not to seek mental health treatment when needed cited fear of having to disclose this information on bar applications as the reason for not seeking treatment.[181] Combined with the study's findings of the prevalence of anxiety, depression, and substance abuse issues for attorneys, this study triggered a renewed interest in amending bar admission rules to eliminate (or significantly revise) mental health questions on character and fitness questionnaires.[182] With the current focus on prioritizing lawyer and law student well-being, the ABA and the Conference of Chief Justices both adopted resolutions to this effect.[183] It has also led law students and attorneys to advocate for change, and some states (either through legislation or changed court rules) to embrace change by eliminating mental health questions altogether.[184] However, some state supreme courts and state bars resist such changes.[185] Some even continue to assert that such invasive inquiries into mental health status are necessary and relevant to protecting

---

[180] *Id.*

[181] Jerome M. Organ, David B. Jaffe & Katherine M. Bender, *Suffering in Silence: The Survey of Law Student Well-Being and the Reluctance of Law Students to Seek Help for Substance Use and Mental Health Concerns*, 66 J. LEGAL EDUC. 116 (2016).

[182] Jaffe & Stearns, *supra* note 148.

[183] Marilyn Cavicchia, *A New Look at Character and Fitness: Bar Leaders, Lawyers, Others Urge Elimination of Mental Health Questions*, A.B.A. (Jan-Feb, 2020) https://www.americanbar.org/groups/bar_services/publications/bar_leader/2019_20/january -february/a-new-look-at-character-and-fitness-bar-leaders-lawyers-others-urge-elimination-of- mental-health-questions/ [https://perma.cc/4SDR-QXEC] ("In August 2015, the ABA House of Delegates adopted Resolution 102, which urged licensing entities to remove questions about mental health history, diagnoses, and treatment, and to focus instead on conduct and behavior. In February 2019, the Conference of Chief Justices approved a substantially similar set of recommendations, Resolution 5.").

[184] *See, e.g., id.* (highlighting actions taken by Virginia law students to advocate change to mental health rules for bar admission); *see also* Jillian Daley, *Putting the Emphasis on Conduct: Oregon State Bar Shifts Its Admissions Process Away from Mental Health and Substance Abuse Labels*, OR. ST. BAR BULL. 34, 35 (Feb./Mar. 2020), https://www.osbar.org/bulletin/issues/2020/2020FebruaryMarch/offline/download.pdf [https://perma.cc/2WNE-D4NQ] (noting Oregon Supreme Court's approval of new rules focused on conduct rather than conditions as recommended by the state bar's Fitness Task Force).

[185] *Id.*

the public despite evidence to the contrary.[186]

### 3. Socioeconomic Impact of Considering Financial Obligations

Historically, bar admission entry requirements effectively created "caste-based restraints," putting legal practice out of reach for anyone other than the highest socioeconomic classes.[187] Some critics argue that the consideration of financial responsibility and existing debts as part of the character and fitness evaluation effectively perpetuates this "caste-based" system.[188] Put differently, critics have suggested that the high costs of law school and the inevitability of significant student loan debt post-graduation for anyone other than the wealthiest students (or families) reinforces a class divide and creates a "double-edged sword" if bar applicants can be denied admission based on their debt.[189] Without incurring debt, students cannot gain the education required to become a lawyer, but by amassing significant debt, they jeopardize their chances for bar admission. As explained further below, the financial impact of the character and fitness review process itself can exacerbate the precarious economic situation for applicants whose approval is delayed because they are unable to secure legal jobs (and salaries) that would allow them to begin repaying their debts.

Concerns about allowing character and fitness committees to review applicants' financial situations may be further amplified by the current pandemic. For many Americans, the current COVID pandemic has resulted in lost jobs, changed family obligations, and significant medical costs, all of which have increased financial strains, especially for individuals who were already in precarious financial positions.

### E. Direct Costs of Time & Money

The damage done by the current invasive process is not limited to those individuals who are denied admission. Even for those applicants who are lucky enough to survive the character review process and are ultimately granted admission to their state bar, the cost in terms of both time and

---

[186] *See* Doe v. Supreme Court of Kentucky, 482 F.Supp.3d 571 (W.D. Ky 2020) (criticizing Kentucky bar's invasive inquiry into mental health issues as part of character and fitness); Ana P. V. Paladino, *Mental Health and the Legal Profession: The Florida Board of Bar Examiners Continues to Violate the Americans with Disabilities Act*, 50 STETSON L. REV. 295, 314 (2021) (explaining that Florida continues to ask questions about mental health as part of its character and fitness questionnaire after an amended preamble, stating the bar must assess mental health as part of satisfying its responsibility to protect the public); Haley Moss, *Raising the Bar on Accessibility: How the Bar Admissions Process Limits Disabled Law School Graduates*, 28 AM. U. J. GENDER SOC. POL'Y & L. 537, 554 (2020) (explaining Indiana's continued use of invasive questions regarding mental health diagnosis are justified by assertion that they are necessary to determine fitness).

[187] Rhode, *supra* note 10, at 494–95.

[188] *Id.*

[189] Munster, *supra* note 88, at 285.

money are significant.[190] The cost of the investigations themselves, in terms of time and money dedicated by each state bar, is also not insignificant and arguably are resources that could be used in alternative ways to better serve the purposes of protecting the public and judicial system from unfit lawyers.[191] Some have even argued that the resource constraints make the investigations themselves less meaningful as well.[192]

A review of recent cases makes clear the often-extended timeline for any applicant who is flagged for investigation during the character and fitness process, including board or committee hearings and ultimate court review. For many applicants, this extended hearing process may delay their admission by a year or more.[193] Beyond the time itself, there are opportunity costs associated with this extended delay in terms of lost jobs, income, and experience.[194]

Imagine graduating from law school, passing the bar exam, possibly even securing a job with the firm of your choice, and then learning that your application was flagged for additional investigation by the Character and Fitness committee. At a minimum, you will likely not be inducted with your classmates. If the committee does not recommend certification after its review, or if the board exercises its discretion to review your application *sua sponte*, the character and fitness process can extend for even longer. Some applications are denied, with permission to reapply in a year or more.[195] Some applicants may seek admission for a decade or more before finally being admitted.[196] Without even calculating the direct monetary costs in terms of hiring an experienced attorney to represent you through the process, the costs in terms of not being able to secure a job in the legal profession in the meantime are significant.[197] As your peers accumulate experience and are promoted, you are left on the sideline, waiting to even

---

[190] *See* Joukov & Caspar, *supra* note 87, at 397.

[191] *See, e.g.*, Rhode, *supra* note 10, at 566, 590.

[192] *See, e.g.*, *id.* at 512.

[193] *See, e.g.*, *In re* Nash, 257 P.3d 130 (Alaska 2011) (granting admission of applicant who originally sought admission in 2007 after being admitted in another state following an extensive character and fitness review there. The applicant was subjected to review by hearing officer who recommended admission and then hearing before board that denied admission despite psychological evaluation finding fitness and fifty-two letters of recommendation in what court determined was a biased hearing).

[194] *See* Joukov & Caspar, *supra* note 87, at 412.

[195] *See, e.g.*, *In re* Silva, 665 N.W.2d 592 (Neb. 2003) (applicant denied but allowed to reapply in two years).

[196] *See, e.g.*, *In re* Wiesner, 943 N.Y.S.2d 410 (N.Y. App. Div. 2012) (admitting applicant who first applied in 1995 on tenth application to bar).

[197] *See, e.g.*, *In re* Application of Griffin, 943 N.E.2d 1008, 1010 (Ohio 2011); *In re* G.W., 13 A.3d 194 (N.H. 2011) (illustrating individuals' circumstances who accumulated significant debt because of bar admission delay); *see also, e.g.*, Munster, *supra* note 88, at 315 (explaining how Robert Bowman's delayed admission caused his student loan debt to increase substantially due to accumulated fees for nonpayment).

begin. The result can be devastating in terms of defaulting on sizable student loans and amassing interest in the intervening years that may result in total debt that can never be repaid.

### F. Constitutional Concerns

The character and fitness process, as currently applied, raises constitutional concerns under due process, equal protection, and the First Amendment.

### 1. Lack of Due

What Rhode identified more than thirty-five years ago as the "prevailing double standards for aspiring and admitted attorneys" continues to exist today.[198] Moreover, concerns about the vagueness of the "good moral character" standard and overbreadth in its potential application continue to raise due process concerns. In addition to the higher standards for bar applicants and bearing the burden of proving fitness, some applicants have noted that the waiting period for individuals with criminal convictions to be granted admission is longer for applicants than for attorneys who are disbarred for similar convictions to seek readmission.[199]

### 2. First Amendment Concerns and Social Media

Decades ago, the U.S. Supreme Court considered First Amendment challenges to bar authorities who sought to deny admission to individuals for refusing to answer questions about past affiliation with the Communist Party. While the court definitively decided that issue, even today, First Amendment concerns remain during the character and fitness process.[200] Rhode explained that "political beliefs may prompt denial for candidates who are unwilling to uphold the Constitution or who have knowingly joined organizations advocating violent overthrow of the government coupled with intent to do so."[201] Similarly, she cautioned that "[a]bolitionists, civil rights activists, suffragists and labor organizers—indeed, the architects of our constitutional framework—all were guilty of 'disrespect for law' in precisely the sense that bar examiners employ it."[202]

Despite First Amendment protections, law students must appreciate the reality that there are pitfalls to posting whatever they want on social

---

[198] *See* Rhode, *supra* note 10, at 493.

[199] *See, e.g.*, *In re* McMillian, 617 S.E.2d 824, 828 (W. Va. 2005) (arguing that disbarred attorneys in West Virginia are only required to wait five years prior to seeking readmission while applicant with four-year-old conviction at time of initial application was required to wait an additional six years prior to being granted even conditional admission).

[200] Jessica Belle, *Social Media Policies for Character and Fitness Evaluations*, 8 WASH. J.L. TECH. & ARTS 107, 115–16 (2012).

[201] Rhode, *supra* note 10, at 567.

[202] *Id.* at 570.

media for the world to see.[203] One legal commentator bluntly states: "Aspiring lawyers need to understand that Internet activity is public behavior and conduct themselves accordingly."[204]

Critics have noted the potential implications of allowing bar examiners to access and review an applicant's social media accounts and posts as part of the character and fitness process.[205] However, the Florida bar has taken it one step further, by adopting a rule requiring applicants to disclose their social media accounts and provide their passwords so that bar examiners can review not only their public behavior, but their private content as well.[206]

It is one thing to punish a student for overtly racial or sexual harassment posted online, but the First Amendment protects those who hold different viewpoints and even much offensive speech.[207] Suppose a bar applicant holds strong political views and posted strong political statements either in support of or against Donald Trump or Joe Biden. This type of political speech remains the core type of speech the First Amendment was designed to protect.[208] Therefore, it should not be evaluated by bar examiners as a means for assessing moral fitness. Furthermore, as Justice Samuel Alito recently wrote, "[v]iewpoint discrimination is poison to a free society."[209] Even the NCBE acknowledges that "[c]onduct that is merely socially unacceptable is not relevant to character and fitness . . . and should not be considered."[210]

## V.        JUSTIFICATIONS

Despite detailed and valid criticisms raised repeatedly over many decades, the basic tenets of the character and fitness requirements for bar admission remain in place in all fifty states. As explained above, the primary justification for requiring prospective lawyers to demonstrate "good moral character" is that the public needs protection from dishonest or untrustworthy lawyers, a worthy intention. More specifically, given the inherent knowledge disparity between attorneys and clients and the sensitive matters that attorneys must handle, attorneys should be expected to prove their trustworthiness before being allowed to engage the public's trust.

---

[203] Colleen T. Scarola, *What Happens on Social Media . . . Could Derail Your Legal Career: Teaching E-Professionalism in Experiential Learning*, 44 Vт. L. Rev. 165, 166 (2019).

[204] Michelle Morris, *The Legal Profession, Personal Responsibility, and the Internet*, 117 YALE L.J. FORUM 53 (2007), https://www.yalelawjournal.org/forum/the-legal-profession-personal-responsibility-and-the-internet [https://perma.cc/89LN-FQDD].

[205] *See* Belle, *supra* note 200, at 118–19.

[206] *Id.* at 113–14.

[207] Texas v. Johnson, 491 U.S. 397, 414 (1989).

[208] First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 777–78 (1978); Mills v. Alabama, 384 U.S. 214, 218–19 (1966).

[209] Iancu v. Brunetti, 139 S. Ct. 2294, 2302 (2019) (Alito, J., concurring).

[210] NAT'L CONF. OF BAR EXAM'RS & ABA SECTION OF LEGAL EDUC. AND ADMISSIONS TO THE BAR, COMPREHENSIVE GUIDE TO BAR ADMISSION 2021, ix (2021).

It is worth noting as well that lawyers are not the only profession that requires applicants to demonstrate good moral character as a criterion for admission. Similar requirements exist in other fields requiring public trust (like doctors and pharmacists), especially where the public may be disadvantaged by a knowledge disparity.[211]

The secondary reason offered in support of character and fitness assessments is that attorneys are officers of the court, and as such, they should be expected to obey laws and respect the rights of others.[212] More specifically, the system of justice could be impaired if unfit individuals were allowed to practice law because judges, courts, and other attorneys need to be able to rely on attorneys to comply with rules of professional conduct that require honesty and ethical behavior.

Consistent with the Supreme Court's directive from 1957 that states can set high ethical standards for lawyers as long as the requirements have a "rational connection" to the practice of law, two legal commentators explain:

> The character and fitness process is appropriate when it identifies conduct that could adversely affect the applicant's ability to practice law. Examples of conduct might include an arrest for driving under the influence of alcohol; attendance problems in class, clinics, or externships; mismanaging personal funds; or the inability to meet deadlines. All of these are relevant and fair issues for evaluation.[213]

Moreover, many people would likely agree that there are examples of individuals who should not be entrusted with the professional responsibilities associated with practicing law, especially the need to protect the rights and interests of others. For example, character and fitness inquiries regarding prior professional misconduct, including disbarment and revocation of other professional licenses, appear directly related to an applicant's demonstrated ability to practice law.[214] Few would likely argue that individuals who have been disbarred permanently in other states should be allowed simply to turn around and practice in a neighboring state.

Therefore, applicants who have been disbarred in other states for violating client trust or abusing judicial process are justifiably denied subsequent admission in other states. Similarly, applicants who demonstrate a pattern of conduct, such as filing frivolous pro se lawsuits or of being held in contempt of court for failing to comply with judicial orders, especially when this conduct continues during law school and throughout the bar

---

[211] *See, e.g.,* Paul F. Camenisch, *On the Matter of Good Moral Character,* 45 THE LINACRE Q. 273, 276 (1978 (discussing the need for doctors' good moral character during licensing board assessments).

[212] *See In re* McCool, 172 So. 3d 1058, 1077 (La. 2015).

[213] Jaffe & Stearns, *supra* note 148.

[214] Hudson, *supra* note 6.

application process, may lack the fitness to practice law based on their blatant abuse or disregard for the legal system. Additionally, applicants who engage in specific acts of dishonesty (such as embezzlement, fraud, or cheating in law school or on the bar exam) may not be currently fit to hold public trust, especially given a temporal proximity of such conduct to their application for bar admission.[215] While there is disagreement over the appropriate temporal connection between illegal or deceptive behavior and denial of admission, and many reject a specific bright line rule regarding required waiting periods, the ability of states to deny bar admission (at least temporarily) to individuals who recently displayed actual conduct that calls into question their trustworthiness appears reasonable. While a categorical ban or even presumption of unfitness is inappropriate for all individuals with prior justice involvement, some limitations may be appropriate.

A few real-world examples help illustrate the appropriateness of maintaining some reasonable inquiries and barriers to entry for attorneys who are entrusted with significant responsibilities for the well-being of others. A recent applicant for admission in Wisconsin was previously disbarred in Florida for misappropriating client trust funds and repeatedly abusing judicial process, including being held in civil contempt by multiple judges for disregarding court orders.[216] Similarly, a recent applicant in Vermont (after being rejected by the Wisconsin bar) was denied admission based on a pattern of disrespect for courts and a demonstrated lack of decorum in the courtroom, including contempt charges by three different judges.[217] A Massachusetts court likewise permanently denied admission to an applicant whose recent conduct (which was reported to the bar by three separate licensed Massachusetts attorneys) demonstrated "a willingness to abuse the legal system for purposes of harassment and intimidation of individuals with whom he has a dispute" and "a lack of civility and professionalism" based on personal attacks and frivolous bar complaints filed against the judge and attorneys involved in his divorce.[218] The Florida bar likewise permanently denied admission to the bar for a former physician whose medical license was revoked because "for over a decade, he improperly used his influence as a treating physician to engage in sexual

---

[215] *See, e.g., In re* Harper, 38 N.E.3d 882, 883–85 (Ohio 2015) (denying the permanent admission of an individual who initially applied in 2000, failed the bar exam multiple times, worked as tax preparer in the intervening years, and was convicted in 2011 of aiding and abetting the filing of false tax returns over a four-year period after law school. The individual failed to fully disclose an IRS investigation and his own bankruptcy proceedings, which were dismissed for his failure to comply with court orders on bar applications. Additionally, in 2010, the individual filed a certification from his treating psychiatrist that said he was completely disabled by chronic fatigue syndrome, making him unable to perform even basic tasks without assistance, to seek a disability release from his student loans.).

[216] *See In re* Hammer, 944 N.W.2d 844, 845-47 (Wis. 2020).

[217] *See In re* Grundstein, 183 A.3d 574, 588–89 (Vt. 2018) (cert. denied).

[218] *In re* Pansé, 38 N.E.3d 298, 300–01 (Mass. 2015).

activities with approximately twenty-five of his patients."[219] The court was persuaded by the fact that lesser conduct by a licensed attorney would result in permanent disbarment and that four separate medical boards had found his conduct sufficiently egregious to deny his application for a license.[220]

The requirement for attorneys to handle client funds provides another specific justification for considering some prior misconduct as part of the licensing process. Lawyers maintain trust accounts and must be good stewards in holding monies that should be dispersed to clients. A nasty word in attorney discipline circles is "commingling."[221] Records from attorney discipline proceedings confirm that lawyers facing financial strife have dipped into client funds.[222] Certainly, then it is reasonable for the character and fitness process to try to screen out those candidates who may be dishonest with financial affairs, steal money, or engage in similar conduct. Decades ago, Justice Felix Frankfurter wrote that good moral character should include the "strictest observance of fiduciary responsibility."[223]

To reiterate, the strongest argument in defense of a character and fitness hurdle is that there are some people who should not be allowed to practice law. They have demonstrated by their conduct that, when placed in stressful situations, they will not refrain from taking other people's money that has been entrusted to them or they have demonstrated other conduct that shows they lack the requisite degree of professional judgment to comply with the high ethical standards and code of professional conduct required of licensed attorneys.

Consider the case of John W. Mustafa II who, as a third-year law student at the University of California at Los Angeles, served as co-chief justice of the school's moot court team.[224] Over a five-month period, Mustafa wrote himself thirteen checks in the amount of $4,331.[225] He claimed that $1,000 was used to bail his sister out of jail.[226] Mustafa later admitted to the conduct and made restitution, paying back all of the money he had embezzled.[227]

Mustafa applied for bar admission in the District of Columbia with the support of strong character references from two law school professors, moot

---

[219] *In re* Fla. Bd. of Bar Exam'rs, 144 So. 3d 532, 534 (Fla. 2014).

[220] *Id.* at 534–35.

[221] *See* William Vogeler, *Seven Deadly Sins Committed by New Lawyers*, FINDLAW: GREEDY ASSOC. (May 26, 2017), https://www.findlaw.com/legalblogs/greedy-associates/7-deadly-sins-committed-by-new-lawyers/ [https://perma.cc/DGR5-DQR8].

[222] *See, e.g.*, *In Re* Disciplinary Action against Eskola, 891 N.W.2d 294 (Minn. 2017); Iowa Sup. Ct. Disc. Bd. v. Guthrie, 901 N.W.2d 493 (Iowa 2017).

[223] Schware v. Bd. of Bar Exam'rs of N.M., 353 U.S. 232, 247 (1957) (Frankfurter, J., concurring).

[224] *In re* Mustafa, 631 A.2d 45, 46 (D.C. 1993).

[225] *Id.*

[226] *Id.*

[227] *Id.*

court members, employers, and others.[228] These references provided "powerful testimony" of Mustafa's good character and a reviewing committee recommended his admission.[229]

However, the District of Columbia Court of Appeals denied him admission.[230] The court reasoned that not enough time had elapsed since the embezzlement for Mustafa to be able to show that he possessed good moral character.[231] The result may seem harsh, but perhaps the District of Columbia judges knew something. In 1994, Mustafa earned admission to the California bar but later faced disciplinary proceedings for commingling client funds and resigned his bar membership in 2002.[232]

Consider also the infamous case of Matthew Hale, who graduated from Southern Illinois University School of Law and passed the Illinois bar exam in 1998, only to be denied admission by the committee on character and fitness grounds for his acknowledged racism and propagation of white supremacy.[233] Hale was the leader of a racist group known as the World Church of the Creator.[234]

After unsuccessful appeals in the state court system and a denial of review by the U.S. Supreme Court, Hale then filed a lawsuit in federal court, alleging a violation of his First Amendment rights of free speech and association.[235] Both a federal district court and the Seventh Circuit rejected his attempt to bypass the Illinois state courts and dismissed his lawsuit.[236] The Seventh Circuit bluntly wrote that Hale's "challenge to the Illinois Supreme Court's decision not to admit him to the bar has been adjudicated, and he must take any further complaints he has about the outcome of that adjudication to the state courts of Illinois."[237]

Hale's later conduct settled all doubts about his character, as he later was convicted of soliciting an undercover FBI informant to murder federal district court Judge Joan Lefkow, who had ruled against Hale in a trademark infringement case over the name Church of the Creator.[238] He received a forty-year prison term.[239]

---

[228] *Id.* at 46–47.

[229] *Id.* at 47.

[230] *Id.* at 47–48.

[231] *Id.* at 48.

[232] *See* THE STATE BAR OF CAL., http://members.calbar.ca.gov/fal/Licensee/Detail/171355 [https://perma.cc/W8LM-FUXG] (listing John Wali Mustafa's attorney profile).

[233] Hale v. Comm. on Character & Fitness for Ill., 335 F.3d 678, 679–80 (7th Cir. 2003).

[234] *Id.* at 679.

[235] *Id.*

[236] *Id.* at 680–84.

[237] *Id.* at 684.

[238] *See* Jodi Wilgoren, *White Supremacist Is Held in Ordering Judge's Death*, N.Y. TIMES (Jan. 9, 2003), https://www.nytimes.com/2003/01/09/us/white-supremacist-is-held-in-ordering-judge-s-death.html [https://perma.cc/D9SJ-JUXJ].

[239] Matt O'Connor, *Hale Gets 40 Years for Plot to Kill Judge*, CHICAGO TRIB. (Apr. 7, 2005),

Beyond the specific examples of individuals who many would agree should not be entrusted with safeguarding and defending the rights of others, some scholars have noted that the disciplinary system and rules of professional conduct alone are not sufficient to protect clients or courts from "bad" lawyers because of the inherent flaws in the attorney discipline system.[240] Recent high-profile examples reinforce the fact that a disciplinary system alone may be insufficient to protect the system of justice from bad actors. In particular, there is concern that it can take many years for a dishonest attorney to be caught, and these "bad actors" may have caused significant and irreparable damage to their clients in the meantime.[241] The state bars are also more reluctant to remove a license once granted because of the impact on the individual's livelihood, which may counsel in favor of at least some initial barriers to entry.[242]

As further justification for maintaining some form of character and fitness inquiry, Rhode noted that there also may be a worthwhile symbolic effect of requiring applicants to demonstrate character and fitness as part of the admissions process.[243] She noted that there is value in trying to improve the image of lawyers and that maintaining a system of professional self-regulation, including appropriate barriers to entry, are a necessary part of building confidence in that system.[244] Rhode stated, "The appearance of moral oversight may help both to preempt the call for external involvement in bar governance processes, and to buttress justifications for banning unregulated (and hence potentially unethical) competitors."[245]

Ultimately, much of the justification for the current system seems to come down to the fact that there is general agreement that attorneys should be trustworthy, a disciplinary system alone is insufficient protection for the public, and no one has yet developed a better system for assessing integrity. While this justification may support the continued existence of some type of character and fitness requirement for bar admission, continued critical evaluation and even significant overhaul of the process to better serve this purpose still appears appropriate.

## VI.     REFORMING THE SYSTEM

As evidenced by the numerous and enduring criticisms, many argue

---

https://www.chicagotribune.com/news/ct-xpm-2005-04-07-0504070253-story.html [https://perma.cc/4GJL-NMPG].

[240] Levin, *supra* note 71; Joukov & Caspar, *supra* note 87.

[241] *See* Dennis Beaver, *Warning Signs of a Dishonest Lawyer*, THE SENTINEL (Nov. 28, 2015), https://hanfordsentinel.com/print-specific/advice/warning-signs-of-a-dishonest-lawyer/article_a8ec28b2-4838-5ad9-9542-709e55b89f87.html [https://perma.cc/2GCD-5ZK2].

[242] *See, e.g.*, Rhode, *supra* note 10, at 509.

[243] *Id.* at 509–12.

[244] *Id.*

[245] *Id.* at 511.

that the current system needs reform. The process should be more transparent, the rules clearer and more consistently applied, in order to increase predictability and avoid discouraging applicants who made mistakes in their past from even attending law school or seeking admission. Bar examiners and courts should rely on social science research on recidivism and sobriety, and they should be required to demonstrate a viable connection between their areas of character inquiry and direct impact on an individual's ability to practice law. State bars should continue to move away from questions regarding mental health diagnoses and treatment, focusing on conduct and present ability. States can improve their process by approaching the character and fitness review with "modesty" and sensitivity, removing expectations for expressed remorse, and considering both gainful employment and success throughout the grueling experience of law school as sufficient evidence of rehabilitation for previously justice-involved individuals.[246] The list of possible improvements is long. Although, as Rhode noted, it is also sometimes in conflict with itself, explaining that clearer standards and bright-line rules conflict with individual assessments of current fitness despite past conduct.[247]

One individual calling for reform is the aforementioned Tarra Simmons. As someone experienced in the criminal justice system as a litigant, she is in an ideal position to advocate for effective reform of the system for other individuals with a criminal record.[248] Simmons expressed concern that the volunteer members of the committee who decided her case did not have access to the decisions of prior committees to ensure consistency and had so little formal guidance from the state supreme court at the time that their decision was necessarily subjective and impacted by their personal biases.[249] She advocates for training for the lawyers who serve on character and fitness boards, including training in implicit bias.[250] She also commended the court in her case for relying on the social science research on recidivism and sobriety, as appropriate evidence for determining current fitness despite prior criminal conduct.[251] Simmons supports an individual approach with flexibility.[252] She also supports a conditional character and fitness approval process prior to beginning law school for those with prior convictions, to allow applicants to make informed decisions about whether to pursue a law degree rather than investing significant time and money in law school only to learn after graduating or even after taking the bar exam that they will not be admitted to practice based on their past convictions.[253]

---

[246] Aviram, *supra* note 69, at 32.
[247] *See* Rhode *supra* note 10, at 588–90.
[248] Simmons, *supra* note 69, at 759.
[249] *Id.* at 767.
[250] *Id.* at 769–70.
[251] *Id.* at 768.
[252] *Id.*
[253] *Id.* at 770.

## VII.   INCREASED USE OF CONDITIONAL ADMISSION

Finally, another proposed reform to improve the fairness of the system is to give character and fitness boards greater use of the power of conditional admission for those borderline applicants whose past conduct gives grounds for valid concern, but who have shown evidence of rehabilitation. More jurisdictions now employ the option of conditional admission when dealing with red-flag applicants.[254] In 1996, Florida became the first state to adopt a system of conditional admission.[255] In 2009, the ABA House of Delegates adopted the ABA Model Rule on Conditional Admission. It provides:

> **1. Conditional Admission.** An applicant who currently satisfies eligibility requirements for admission to practice law, including fitness requirements, and who possesses the requisite good moral character required for admission, may be conditionally admitted to the practice of law if the applicant demonstrates recent successful rehabilitation from chemical dependency or successful treatment for mental or other illness, or from any other condition this Court deems appropriate, that has caused conduct that would otherwise have rendered the applicant currently unfit to practice law. The [Admissions Authority] shall recommend appropriate conditions that the applicant to the bar must comply with during the period of conditional admission.[256]

Under this process, a person is conditionally admitted for a period of time (usually from one year up to five years) under the guidance and supervision of a licensed attorney in good standing. If he or she makes it through that year without incident or trouble, then the person's admission becomes one for full admission. In this way, conditional admission allows an applicant the opportunity to be judged on their actual ability to practice law when placed in real-world stressful situations, similar to proposals for "residency-like" programs for law students, rather than relying on a backward-looking system that attempts to predict future behavior. Conditional admission gives bar regulators a little more leeway in addressing those who may have had problems in their past and offers something more than the all-or-nothing admit-or-deny option for applicants.

In some jurisdictions, conditional admission is limited. For

---

[254] Use of conditional admission, however, must still be based on individual assessment and should not be used like it was in Louisiana, as a categorical response to all applicants who disclose a mental health diagnosis or any other category that triggers a red flag. *See Chart 2: Character and Fitness Requirements, supra* note 68; Letter from Jocelyn Samuels, *supra* note 155, at 27.

[255] Janice M. Holder, *Completing the Puzzle: Lawyer Assistance and Conditional Admission,* 49 DUQUESNE L. REV. 439, 446 (2011).

[256] MODEL RULE ON CONDITIONAL ADMISSION TO PRAC. L. (AM. BAR ASS'N 2009).

example, conditional admission may be available only to those applicants who are under a rehabilitative program for a substance abuse problem, a diagnosed mental or physical impairment, or a financial affairs problem (child support arrearage or bankruptcy).[237] Other states allow conditional admission for nearly any type of applicant whose history is cause for concern.[238] For example, Tennessee has a broader rule on conditional admission that allows the board to conditionally admit an applicant based on their financial problems, prior criminal history, or any other conduct that gives the character and fitness board cause for concern.[239] Maine has a similarly broad rule that allows for conditional admission when an applicant has failed to make the requisite showing of good moral character but has made a "good faith effort" to cure the problems in the past and "has in place a support system" including a responsible individual who can monitor the individual.[260]

## VIII.   CONCLUSION

Character screening is an endemic part of the lawyer licensing process, as it has been for a long time. Some form of screening is necessary,

---

[237] Stuart Duhl, *Admission to the Bar in Illinois: A Historical Perspective for the Last Half Century and Beyond*, 36 S. ILL. U. L.J. 109, 119 (2011).

[238] *See* Tenn. Sup. Ct. R. 7, § 10.05(c) (noting that "The Board in its discretion may condition an applicant's admission by requiring compliance with conditions that are designed to detect behavior that could render the applicant unfit to practice law and to protect the clients and the public. The conditions shall be tailored to detect and deter conduct, conditions or behavior which could render an applicant unfit to practice law or pose a risk to clients or the public, and to encourage continued abstinence, treatment, remediation, counseling, or other support.").

[239] *See* Tenn. Sup. Ct. R. 7, § 10.05(b)(2) ("The Board may consent to entry of an Agreed Conditional Admission Order for an applicant based on the applicant's record and the recommendation of qualified professionals, when appropriate, and the determination that the applicant currently satisfies all requirements for admission and the applicable Character and Fitness Standard under section 6.01 while engaged in a sustained and effective course of treatment, remediation, or monitoring.").

[260] *See* ME. BAR ADMISS. R. 9A ("(a) Conditional Admission. Following a determination that an applicant has not produced satisfactory evidence of good character and fitness to practice law pursuant to Rule 9 and upon findings that: (1) the conditions that led to the determination that the applicant has not produced satisfactory evidence of good character and fitness to practice law are in the past and are not likely to recur; (2) the applicant has made and is making a good faith effort to cure or avoid the conditions that led to the determination; and (3) the applicant has in place a support system, including an identified responsible individual, to monitor and assist the applicant in maintaining good and ethical conduct and to regularly report on the applicant's progress and any problems to the Board of Overseers of the Bar; the Board, with the written consent of the applicant, may recommend to the Court that the applicant be admitted on a conditional basis. Provided, however, that a lawyer who has been disbarred or suspended from the practice of law or has resigned from the practice of law in another jurisdiction, and has not been reinstated to the practice of law in that other jurisdiction shall be ineligible for conditional admission pursuant to these Rules.").

as lawyers are officers of the court and fiduciaries with whom people repose a great deal of trust with their most intractable and important problems. But the process should be revamped to ensure it is fair and equitable. Any remaining vestiges of discrimination, whether against racial minorities or individuals with disabilities, must be eliminated. State bars and courts should continue to move toward awareness of social science research to determine appropriate evidence and factors for consideration in evaluating current moral character. Alternatives, such as an expansion of conditional admission or law student residency programs that focus on current fitness rather than past conduct, should be considered. In many instances, people who have made mistakes should not pay for those mistakes forever. Sometimes, people fall on hard financial times. A bad credit history should not necessarily preclude someone from becoming an attorney. Furthermore, a criminal conviction should not doom a person forever, provided they present credible evidence of rehabilitation and good acts. People should be given the benefit of the doubt when they present credible evidence that they have turned their lives around, without needing to perform remorse.[261] There is always the possibility of human redemption.[262]

---

[261] *See, e.g.*, *In Re* Sobin, 649 A.2d 589, 592 (D.C. 1994) ("We believe our decision today is consistent with encouraging individuals who have had past troubles to 'turn over a new leaf' and to seek admission to the Bar.").

[262] *See* Swisher, *supra* note 38, at 1063 ("[A] profession that routinely denies applicants for conduct that happened, on average, over nine years earlier—and
often when applicants were fairly young—devalues forgiveness and redemption.").

# **<u>EXHIBIT B</u>**

# St. John's Law Review

Volume 82, Summer 2008, Number 3                                          Article 8

# The Troubling Rise of the Legal Profession's Good Moral Character

Keith Swisher

Follow this and additional works at: https://scholarship.law.stjohns.edu/lawreview

This Article is brought to you for free and open access by the Journals at St. John's Law Scholarship Repository. It has been accepted for inclusion in St. John's Law Review by an authorized editor of St. John's Law Scholarship Repository. For more information, please contact selbyc@stjohns.edu.

# THE TROUBLING RISE OF THE LEGAL PROFESSION'S GOOD MORAL CHARACTER

### KEITH SWISHER[†]

INTRODUCTION....................................................................1038

I. THE CROOKED HISTORY OF AMERICAN CHARACTER REVIEW ......1039

II. THE MECHANICS OF MODERN CHARACTER REVIEW.....................1043

III. THE PUZZLING RISE OF MODERN CHARACTER REVIEW................1046

    A. Methodology and Disclaimers ............................................1046

    B. Results .................................................................................1048

    C. Potential Reasons for the Rise ...........................................1051

IV. ILLUSTRATIONS OF MODERN CHARACTER REVIEW IN THEORY AND APPLICATION ................................................................1052

    A. Methodology.......................................................................1053

    B. Character Review in Application and Theory ...................1054

    C. Preliminary Conclusions....................................................1056

V. THE MERIT OF MODERN CHARACTER REVIEW.............................1059

    A. Problems and False Justifications ......................................1059

        1. Self-Image: A Shallow Justification ............................1059

        2. The Displaced Values of Forgiveness and Redemption ................................................................1063

        3. Additional Condemnation: Arbitrariness, Class Oppression, and Public Perception...............................1064

        4. The Misplaced Legal Education Objection ...................1065

    B. The Limited Merit of Character Screening ........................1067

CONCLUSION: PARTING ADVICE FOR PARTICIPANTS IN THE CHARACTER REVIEW PROCESS....................................................1069

---

† Adjunct Professor of Law, Arizona State University; Osborn Maledon, PA; LL.M., Harvard Law School; J.D., *summa cum laude*, B.S., *summa cum laude*, Arizona State University. Special thanks to Deborah L. Rhode, Stanford Law School, for her review of an earlier draft of this Article. I also thank Daniel R. Coquillette, Boston College and Harvard Law Schools, and J.L.A. Garcia, Professor of Philosophy, Boston College, for their brief, but extremely helpful, comments on various ideas expressed in this Article. Many thanks are due as well to Mark I. Harrison, whose incomparable legal experience informed much of the case discussion. I finally thank Eric M. Fraser, J.D./M.B.A. Candidate, University of Chicago, for his valuable data analysis.

INTRODUCTION

> *The requirement that applicants to the bar possess "good moral character," although well-established . . . today, appears to be a relatively recent arrival to Anglo-Saxon jurisprudence. For much of American history attorneys distinguished themselves, not by good works and saintly disposition, but by acts of violence that would confine them to imprisonment if committed in modern America. . . .*
>
> . . . .
>
> *. . . By the 1920s, states began to create "moral fitness committees," inevitably composed of persons with spotless backgrounds. By the middle of the twentieth century, moral character investigations grew to encompass such matters as divorce, cohabitation, and even violation of fishing license statutes. While empirical research establishes no correlation between "problem" applications and later disciplinary proceedings, the modern character and fitness process is viewed as an important component in the maintenance of the legal profession's public standing.*[1]

Under a reasonable working assumption, I had expected to show that the profession's "good moral character" requirement for admission had returned to an all-time low.[2]   That is, the following study of the published decisions and scholarly research should have proven that bar associations and state supreme courts had loosened significantly their views of disqualifying moral character.   That conclusion would not have been the bad thing that one might assume.[3]

I was wrong.   What the research instead shows is that strict moral character screening not only continues to thrive, but *it has reached an all-time high*.   To be sure, character screeners have

---

[1] Roger Roots, *When Lawyers Were Serial Killers: Nineteenth Century Visions of Good Moral Character*, 22 N. ILL. U. L. REV. 19, 19, 34–35 (2001) (footnotes omitted).

[2] Several commentators corroborated my initial assumption. *See, e.g.*, Maureen M. Carr, *The Effect of Prior Criminal Conduct on the Admission to Practice Law: The Move to More Flexible Standards*, 8 GEO. J. LEGAL ETHICS 367, 368 (1995) ("In recent years, cases and changing rules have highlighted the fact that bar admission committees and courts have become somewhat more forgiving in their acceptance of [applicants with criminal records] into the legal profession. *This position represents a change from earlier, stricter stances.*" (emphasis added)).

[3] Public safety rhetoric notwithstanding, most of the moral character barrier is merely a means of protecting the profession's public image. That weak and self-protective justification should be abandoned or at least narrowly circumscribed. *See infra* Parts IV–V.

*THE TROUBLING RISE*

limited their use of truly irrelevant (and probably unconstitutional) inquiries, such as cohabitation and communism. With respect to this Article's primary concern, character screening in response to applicants' criminal records, however, the reported cases—and reported denials of admission—have never been higher. That is to say, the number of these cases has never been higher—not even close—in this country's entire history. Thus, what I had assumed was a dying vestige of an unreasonably unforgiving age is actually a fixed and growing epidemic in which the bar continues to exclude applicants who could do the work ethically, but who allegedly would tarnish the bar's public standing.

This Article ultimately demonstrates that the bar's "moral judges" have developed an unintelligible crucible through which to run problem applicants. Part I lists the surprisingly sinister history of moral character review. Part II provides an overview of its current application. Part III, through compiling and coding the published opinions over the last quarter century, documents the marked rise in character screening of applicants with criminal records. Part IV illustrates that character screening, as applied, is both perverse and unrealistic. Part V weighs the arguments for character review and determines that they are overwhelmingly baseless.[4] Part VI concludes by offering some parting advice to the participants in the character review process.

## I.   THE CROOKED HISTORY OF AMERICAN CHARACTER REVIEW

While some have attempted to legitimize the "good moral character"[5] requirement by alluding to its long-standing roots,

---

[4] After apparently cursory reviews of publicly available drafts of this Article, some commentators have denounced (inaccurate summaries of) my views as radical. Because of these misconceptions, I deny explicitly what was already implicit in the Article: I am not in favor of crime or immoral (or even amoral) character. Indeed, one of my "ground projects" is to infuse ethics into the practice of law. *See, e.g.*, Keith Swisher, *The Moral Judge*, 56 DRAKE L. REV. (forthcoming 2008) (articulating adjudicatory justice and anticipating the moral adjudicator). Unfortunately, as described in detail in this Article, the past and present "good moral character" requirement does not assist legal practice in this, or virtually any other, laudable goal. Nevertheless, the limited merit of character screening is acknowledged and addressed in Part V below and its limited future utility is discussed in the Conclusion.

[5] The most frequently quoted definition of "good moral character" is Justice Frankfurter's:

the real story hardly reveals a time-honored tradition.[6]  Indeed, as we will see, the bar did not begin officially enforcing "good moral character" until well into the twentieth century.[7] Furthermore, when enforcement finally occurred, both its motivations and outcomes were extremely problematic.

American character screening "in form"—but not in practice—began appearing in the mid-seventeenth century in response to "animus against lawyers' 'blood-suck[ing]' practices."[8] State legislatures, therefore, "sought to impose character requirements for admission to the bar."[9]  The resulting statutes,

---

> One does not have to inhale the self-adulatory bombast of after-dinner speeches to affirm that all the interests of man that are comprised under the constitutional guarantees given to "life, liberty and property" are in the professional keeping of lawyers. . . . From a profession charged with such responsibilities there must be exacted those qualities of truth-speaking, of a high sense of honor, of granite discretion, of the strictest observance of fiduciary responsibility, that have, throughout the centuries, been compendiously described as "moral character."

Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 247 (1957) (Frankfurter, J., concurring).

[6] *See* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 2 cmt. d (2000) (alluding to the fact that "as far back as the first bars in medieval England efforts have been made to screen candidates for the bar with respect to their character"). The Restatement does note, however, the inquiry's long-standing problems occasioned by

> the difficulty of defining the standards of character thought to be minimal, the difficulty of ensuring fair application of . . . standards under the claim of rigorous examination, and the overriding difficulty of predicting future professional conduct from a necessarily abbreviated personal history and the committee's access to such past activities as are sufficiently public to be checked.

*Id.*

[7] There was, however, "one major exception to open membership"—women: United States Supreme Court Justice Stephen J. Field (a man who was arrested and disbarred more than once during his own career) was willing to allow a lynch mob killer to practice law but concluded that women should be barred from the practice because the "natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life."

Roots, *supra* note 1, at 22 (quoting Bradwell v. Illinois, 83 U.S. (16 Wall.) 130, 141 (1873) (Bradley, J., concurring)) (footnotes omitted).

[8] Deborah L. Rhode, *Moral Character as a Professional Credential*, 94 YALE L.J. 491, 496 (1985). Professor Rhode's exhaustive article remains the preeminent work on the subject of moral character screening. This Article in part updates and expands some of her relevant conclusions using court decisions, scholarly studies, and commentary from the twenty-plus years since she published her article.

[9] *Id.* at 496–97 (noting requirements such as references from ministers and court examination).

however, appeared to be ineffectual or unused.[10]  Indeed, in the entire nineteenth century, there were virtually no reported instances in which applicants were banned for their character.[11]

Character screening effectively arrived in the early twentieth century.  By 1927, a supermajority of the states had "strengthen[ed] character inquiries through mandatory interviews, character questionnaires, committee oversight, or related measures."[12]  For the legal profession, the rise in character screening seems to have arisen from several problematic concerns:  "Much of the initial impetus for more stringent character scrutiny arose in response to an influx of Eastern European immigrants, which threatened the profession's public standing.  Nativist and ethnic prejudices during the 1920s, coupled with economic pressures during the Depression, fueled a renewed drive for entry barriers."[13]

The operation proved successful; it dropped the admitted number of persons from "unworthy" groups.[14]  The strict scrutiny did not end with ethnicity or gender.  Instead, using the

---

[10] *Id.*

[11] *See id.* at 497; Roots, *supra* note 1, at 21–22. Indeed, American attorneys and judges had a notable history of violence, for which they suffered no denials of admission or professional discipline. *See* Roots, *supra* note 1, at 22–34 (documenting numerous instances of undisciplined violence by famous and not-so-famous attorneys, judges, and two former Presidents).

[12] Rhode, *supra* note 8, at 499; *see also* ROBERT STEVENS, LAW SCHOOL: LEGAL EDUCATION IN AMERICA FROM THE 1850S TO THE 1980S 94–95 (1983) (discussing the rise of bar examiner committees in the states). The rise in character requirements paralleled that of other "professions" during the period, including "barbers, beauticians, embalmers, engineers, veterinarians, optometrists, geologists, shorthand reporters, commercial photographers, boxers, piano tuners, trainers of guide dogs for the blind, and—ironically enough—vendors of erotica." Rhode, *supra* note 8, at 499.

[13] Rhode, *supra* note 8, at 499–500; *see also id.* at 500–01 (recounting an instance "[a]t the first National Bar Examiners Conference in 1933, [in which] the former Chairman of the ABA's section on Legal Education and Admission acknowledged that 'sometimes you have wonderful character evidence displayed even though the applicant is not well educated or his parents were born in Russia' " (quoting *Character Examination of Candidates*, 1 B. EXAMINER 63, 72 (1932))).

[14] *See* JEROLD S. AUERBACH, UNEQUAL JUSTICE 127 (1976); Rhode, *supra* note 8, at 501 (citing percentages); *see also* STEVENS, *supra* note 12, at 92–103 (discussing the ABA's efforts to establish market controls in the early twentieth century, which included "ethnic" controls); Patrick L. Baude, *An Essay on the Regulation of the Legal Profession and the Future of Lawyers' Characters*, 68 IND. L.J. 647, 648 (1993) ("Powerful historic accounts have argued that the reforms earlier in the century were more effective at elevating the income and status of the profession than at protecting the public.").

justification that " 'with an overcrowded bar and an abundance of candidates who have unquestioned character,' " the bar excluded *all* perceived "problem" applicants, such as "radicals, religious fanatics, divorcees, fornicators, and any individual who challenged the profession's anticompetitive ethical canons."[15] The bar then went after communists, and although it achieved modest initial success in barring them, its ultimate defeat was memorialized in two famous Supreme Court opinions.

The Constitution finally caught up to arbitrary character review: Screening requirements henceforth had to have a rational connection to fitness to practice law.[16] At that point, in the late 1950s, one reasonably could have assumed—indeed, one reasonably could have demanded—that the bar would dismantle character review.[17] As we will see, however, such a reasonable assumption somehow never materialized.[18]

"Despite relatively powerful rhetoric and argument against such inquiries, . . . ex ante inquiries into character and fitness . . . remain a major feature of admission to the legal profession."[19] Although the reported data generally do not suggest that large numbers are excluded through modern

---

[15] Rhode, *supra* note 8, at 502 (quoting *An Answer to the Problem of the Bootlegger's Son*, 1 B. EXAMINER 109, 110 (1932)).

[16] *See* Konigsberg v. State Bar of Cal., 353 U.S. 252, 263–64 (1957); Schware v. Bd. of Bar Exam'rs, 353 U.S. 232, 238–39 (1957) (holding that due process and equal protection require a rational connection between character screening and fitness to practice law). In *Konigsberg*, the Court stated that the bar's moral character requirement was "a vague qualification, which is easily adapted to fit personal views and predilections, [and] can be a dangerous instrument for arbitrary and discriminatory denial of the right to practice law." 353 U.S. at 263.

[17] *See* Baude, *supra* note 14, at 649. Patrick Baude has noted the troubling history of character review and the even more troubling persistence of it:

> Among sociologists and historians of the legal profession, it is a common belief that these character and fitness restrictions were aimed at keeping the American bar as Anglo-Saxon as possible. . . . It seems clear that the requirements no longer serve their original purpose. Even more striking, it seems hard to see that the requirements serve *any* straightforward purpose.

*Id.* (footnote omitted).

[18] In fact, in the early 1970s, the bar even achieved a roundabout victory on the communism issue. *See* Law Students Civil Rights Research Council v. Wadmond, 401 U.S. 154, 165–66 (1971) (allowing committees to ask questions designed to discover communism and ultimately permitting committees to deny admission to applicants who refuse to answer their questions).

[19] John S. Dzienkowski, *Character and Fitness Inquiries in Law School Admissions*, 45 S. TEX. L. REV. 921, 922–23 (2004) (footnote omitted).

character review, "the system's greatest significance may lie in its deterrent and legitimating dimensions."[20]

## II. The Mechanics of Modern Character Review

Every state requires applicants to prove good moral character before admission to the bar.[21] Bar committees ordinarily screen applicants for the requisite good moral character.[22] In practice, "good" moral character means the absence of proven "misconduct."[23] Thus, according to the bar, "relevant conduct" in this inquiry is all of the following:

> [U]nlawful conduct; academic misconduct; making of false statements, including omissions;[24] misconduct in employment; acts involving dishonesty, fraud, deceit or misrepresentation; abuse of legal process; neglect of financial responsibilities; neglect of professional obligations; violation of an order of a court; evidence of mental or emotional instability; evidence of drug or alcohol dependency; denial of admission to the bar in another jurisdiction on character and fitness grounds;

---

[20] Rhode, *supra* note 8, at 502.

[21] *See* Nat'l Conference of Bar Exam'rs & Am. Bar Ass'n Section of Legal Educ. & Admissions to the Bar, Comprehensive Guide to Bar Admission Requirements 6–7 chart II (2007) [hereinafter NCBE Guide]; *see also id.* at vii ("A bar examiner should exhibit courage, judgment and moral stamina in refusing to recommend applicants . . . who lack moral character and fitness.").

[22] Applicants bear the burden of showing good moral character, and they can be denied admission for failing to provide relevant (and even irrelevant) information to the committees. *See, e.g.*, Model Rules of Prof'l Conduct R. 8.1(b) (2003) (requiring applicants to answer committee questions).

[23] Bruce E. May, *The Character Component of Occupational Licensing Laws: A Continuing Barrier to the Ex-Felon's Employment Opportunities*, 71 N.D. L. Rev. 187, 199 (1995) ("An Alabama court circularly defined 'good moral character' to practice law 'as an absence of proven conduct or acts which have been historically considered manifestations of moral turpitude.'" (quoting Reese v. Bd. of Comm'rs, 379 So. 2d 564, 569 (Ala. 1980))); *see, e.g.*, Konigsberg v. State Bar of Cal., 353 U.S. 252, 263 (1957) (noting that moral character is the "absence of proven conduct or acts which have been historically considered as manifestations of 'moral turpitude'").

[24] In order to "maintain[] the integrity of the profession," the Model Rules of Professional Conduct echo this duty:

> An applicant for admission to the bar . . . shall not: (a) knowingly make a false statement of material fact; or (b) fail to disclose a fact necessary to correct a misapprehension known by the person to have arisen in the matter, or knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority . . . .

Model Rules of Prof'l Conduct R. 8.1 (2002).

disciplinary action by a lawyer disciplinary agency or other professional disciplinary agency of any jurisdiction.[25]

The ultimate question is "whether the *present* character and fitness of an applicant qualifies the applicant for admission," even though the inquiry almost exclusively looks at past acts.[26] Every state bar application thus asks questions designed (sometimes crudely) to elicit this wealth of past "relevant conduct."

To elicit past criminal records, in particular, both bar and law school applications make broad inquiries into applicants' past criminal conduct. A typical question asks, "Have you ever been arrested, cited for, or charged with a crime or a delinquent act?"[27] Law school applications ask similar questions. One law professor has suggested that the use and breadth of schools' questions have increased within the last decade or two.[28] In a 2003 survey, all of the top twenty law schools "ask[ed] [for] information about an applicant's conduct relating to the criminal laws."[29] Fifteen of these schools, however, asked only about convictions, not arrests or charges.[30] Almost all of the Texas schools, in comparison, asked about arrests.[31]

In theory, however, applicants' criminal records—including felony convictions—do not preclude bar admission in nearly all of the states.[32] Only three states—Indiana, Missouri, and perhaps

---

[25] NCBE GUIDE, *supra* note 21, ¶ 13, at viii; *see, e.g.*, ARIZ. SUP. CT. R. 36(b)(3).

[26] NCBE GUIDE, *supra* note 21, ¶ 15, at viii (emphasis added).

[27] DANIEL R. COQUILLETTE, REAL ETHICS FOR REAL LAWYERS 647 (2005) (excerpt from an Iowa bar application); *see also id.* at 654 ("Have you ever been charged with or been the subject of any investigation for a felony or misdemeanor other than a minor traffic charge?" (excerpt from a Massachusetts bar application)).

[28] Dzienkowski, *supra* note 19, at 923–24 (noting that the University of Texas added a criminal record question after 1988, and "suspect[ing] that during the last fifteen years, educational institutions have added questions to their applications with an idea to warn students about the bar process and to exclude applicants with serious character issues").

[29] *Id.* at 927.

[30] *Id.*

[31] *Id.* The disparity could be explained partially by the subtle insecurity complex that many of the lower-ranked schools seem to exhibit. Given this (unproven) preoccupation with professional reputation and standing, then, they may be more likely to screen applicants who might bring negative publicity to their institution. *See infra* Parts V.A.1, V.A.4.

[32] *See* Carr, *supra* note 2, at 368–69 (citing NAT'L CONFERENCE OF BAR EXAM'RS & AM. BAR ASS'N SECTION OF LEGAL EDUC. & ADMISSIONS TO THE BAR, COMPREHENSIVE GUIDE TO BAR ADMISSION REQUIREMENTS (1994)). Some states have "five-year" rules—meaning that bar applicants cannot be admitted for a set

Oregon—apparently do not permit certain convicted felons to practice law, ever.[33] The rest of the states use a presumptive disqualification approach.[34] This approach requires that problem applicants prove that they are fully rehabilitated and possess present good moral character.[35] "For bar fitness purposes, rehabilitation is the reestablishment of the reputation of a person by his or her restoration to a useful and constructive place in society."[36] In making these determinations, committees ostensibly balance all of the following factors:

> [T]he applicant's age at the time of the conduct; the recency of the conduct; the reliability of the information concerning the conduct; the seriousness of the conduct; the cumulative effect of conduct or information; the evidence of rehabilitation; the applicant's positive social contributions since the conduct; the applicant's candor in the admissions process; [and] the materiality of any omissions or misrepresentations.[37]

---

number of years, usually five, following a felony conviction. *See infra* Conclusion.

[33] *See* NCBE GUIDE, *supra* note 21, at 6–7 chart II. Oregon apparently uses a problematically selective bar to felons. *See generally In re* Beers, 118 P.3d 784 (Or. 2005) (per curiam) (waiving court rule barring admission to applicants who have been convicted of a felony of moral turpitude, and admitting applicant who had been convicted thirteen years earlier of felony conspiracy to distribute cocaine and various misdemeanors, while minimally noting applicant's lack of candor).

[34] Carr, *supra* note 2, at 383–84 ("The current majority approach of presumptive disqualification attempts to strike a balance among several competing concerns: protecting the public, safeguarding the image of the legal profession, and allowing a fully rehabilitated individual the opportunity to serve the community in the capacity of his or her choice.").

[35] *See id.* at 384. Some courts employ a "two-step inquiry":
> We first consider whether the applicant has satisfied the burden of proving complete rehabilitation from the character deficits that led to the commission of the crime. If not, our inquiry ends and we will deny the application. If the applicant proves complete rehabilitation, we then decide whether the applicant has otherwise demonstrated present good moral character.

*In re* King, 136 P.3d 878, 882 (Ariz. 2006) (denying admission to applicant who had committed attempted murder using a firearm almost twenty years earlier).

[36] Carr, *supra* note 2, at 386 (quoting *In re* Cason, 294 S.E.2d 520, 522–23 (Ga. 1982) (internal quotation marks omitted)); *see also id.* (noting that examiners "assess whether the problems of the past continue and, if they do not, whether the applicant's life has changed in ways that suggest the problems are unlikely to recur" (internal quotation marks omitted)).

[37] NCBE GUIDE, *supra* note 21, ¶ 15, at viii; *see, e.g.*, ARIZ. SUP. CT. R. 36(b)(4); MONT. R.P. COMM. ON CHAR. & FIT. § 4(c).

*ST. JOHN'S LAW REVIEW*

In effect, the difficulty of establishing rehabilitation and therefore good moral character "is determined by the gravity of the past criminal conduct."[38]

As courts have admitted frankly, "[i]n the case of extremely damning past misconduct, . . . a showing of rehabilitation may be virtually impossible to make."[39]

### III. The Puzzling Rise of Modern Character Review

This part documents the troubling rise in character screening for past criminal conduct. It reveals an increase of puzzling proportions over the last quarter century. Before we turn to the numbers, however, the following section briefly describes the general methodology for compiling and coding the cases and offers some cautionary remarks concerning the data.

### A. *Methodology and Disclaimers*

This research builds on Professor Rhode's seminal work in this area.[40] In doing so, it briefly compares her half-century's worth of data to this Article's (nearly) quarter-century's worth. George Blum's annotation greatly assisted my research.[41] Those citations were then supplemented through searches on Westlaw's electronic database. It still should be noted that it is quite possible that a few opinions were not found. If that in fact is the case, it fortunately does not affect my conclusions; indeed, more cases would corroborate them further.[42] With respect to the

---

[38] *In re King*, 136 P.3d at 882.

[39] *Id.* (quoting *In re* Mathews, 462 A.2d 165, 176 (N.J. 1983) (internal quotation marks omitted)); *In re* T.J.S., 692 A.2d 498, 502 (N.H. 1997) (quoting *In re Mathews*, 462 A.2d at 176); *see also In re* Dortch, 486 S.E.2d 311, 320 (W. Va. 1997) ("[W]e agree with the majority of states that an applicant who has previously been convicted of a felony or other serious crime carries a heavy burden of persuading this Court that he presently possesses good moral character sufficient to be invited into the legal community of this State.").

[40] *See generally* Rhode, *supra* note 8.

[41] *See generally* George L. Blum, *Criminal Record as Affecting Applicant's Moral Character for Purposes of Admission to the Bar*, 3 A.L.R.6TH 49 (2005).

[42] *See infra* Parts IV–V. In short, even if there were more (discernible) character opinions, and even if in those opinions state supreme courts admitted the applicants, it still would mean that committees are denying higher numbers of applicants. *See also infra* note 43 and accompanying text (explaining the skewed reporting of admissions and denials).

cases in general, however, there are several reasons to use these numbers cautiously:  "First, unless bar admission authorities seek to block an applicant's admission on moral character grounds, the result of the moral character assessment is generally not reported. . . .  Second, courts are often cursory in describing the underlying facts and in offering the rationales for their decisions in moral character cases."[43]  Indeed, many published decisions provide little-to-no facts or law.[44]

Furthermore, for comparison purposes, there are also internal reasons to view these numbers with caution.  The first fifty years' worth of comparison derives exclusively from another author's published work.  Among other difficulties, our collection and categorization may not match perfectly.[45]  As we will see, the resonating points do not hinge on such potentialities, but they should be kept in mind.

---

[43] Michael K. McChrystal, *A Structural Analysis of the Good Moral Character Requirement for Bar Admission*, 60 NOTRE DAME L. REV. 67, 69–70 (1984).

[44] *See, e.g., In re* Sanderson, 875 A.2d 702, 702–03 (Md. 2005) (ordering admission without listing underlying facts); *see also In re* Brown, 895 A.2d 1050, 1062–63 (Md. 2006) (Bell, C.J., dissenting) (implying that many, if not most, of the sixty-five Maryland character cases in the last thirty years were disposed of by a brief order).

[45] I have tried to alleviate this problem by conforming my own results to Professor Rhode's presentation and categorization.

*ST. JOHN'S LAW REVIEW*

## B. Results

TABLE ONE: PUBLISHED OPINIONS INVOLVING CRIMINAL RECORD CHARACTER REVIEW, 1931 TO 1971[46]

|  | Admitted | Denied | Remanded | Total Cases |
|---|---|---|---|---|
| Criminal Record* | 3 | 7 | 0 | 10 |
| Felonies | 1 | 2 | 0 | 3 |
| Non-Felonies | 2 | 4 | 0 | 6 |
| Unspecified | 0 | 1 | 0 | 1 |
| Additional Factors** | 0 | 4 | 0 | 4 |

\* Criminal record, for present purposes, includes arrests, charges, and indictments, regardless of ultimate convictions.[47]

\*\* Additional factors are any instances of non-criminal misconduct, the most frequent of which is alleged lack of candor during the screening process.

---

[46] As indicated above, tables one and two use Professor Rhode's data; the format for all three tables was adapted from her Tables 5 and 6. *See* Rhode, *supra* note 8, at 537 tbls.5 & 6.

[47] It is not entirely clear, however, that Professor Rhode's study uses the same definition as is being used in the present study. *See infra* Table Three; *see also* Blum, *supra* note 41, at 49 n.2 (using the same definition). This definition, of course, excludes conduct that may be criminal in nature but is not accompanied at least by an arrest. *See, e.g., In re* Mustafa, 631 A.2d 45, 46–48 (D.C. 1993) (denying admission to applicant who converted funds in his law school's moot court account approximately three years earlier; noting that, although applicant admitted to the wrongdoing, he had not been arrested).

TABLE TWO: PUBLISHED OPINIONS INVOLVING CRIMINAL RECORD CHARACTER REVIEW, 1972 TO 1982[48]

|  | Admitted | Denied | Remanded | Total Cases |
|---|---|---|---|---|
| Criminal Record* | 13 | 12 | 2 | 27 |
| Felonies | 3 | 1 | 2 | 6 |
| Non-Felonies | 3 | 3 | 0 | 6 |
| Unspecified | 7 | 8 | 0 | 15 |
| Additional Factors** | 6 | 8 | 1 | 15 |

\* Criminal record, for present purposes, includes arrests, charges, and indictments, regardless of ultimate convictions.

\** Additional factors are any instances of non-criminal misconduct, the most frequent of which is alleged lack of candor during the screening process.

*ST. JOHN'S LAW REVIEW*

TABLE THREE: PUBLISHED OPINIONS INVOLVING CRIMINAL RECORD
CHARACTER REVIEW, 1983 TO 2006[49]

|  | Admitted | Denied | Remanded | Total Cases |
|---|---|---|---|---|
| Criminal Record* | 25 | 60 | 3 | 88 |
| Felonies | 8 | 26 | 1 | 35 |
| Misdemeanors | 2 | 7 | 0 | 9 |
| Unspecified | 15 | 27 | 2 | 44 |
| Additional Factors** | 7 | 45 | 0 | 52 |

* Criminal record, for present purposes, includes arrests, charges, and indictments, regardless of ultimate convictions.

** Additional factors are any instances of non-criminal misconduct, the most frequent of which is alleged lack of candor during the screening process.

[49] These numbers do not include cases in which the underlying criminal conduct was not at issue. Such cases could include, for example, a remand to rule on the issue for the first time, or the violation of a local rule that required any applicant who had been admitted in another state to be in good standing in that state at the time of application. *E.g., In re* Adornato, 301 F. Supp. 2d 416, 418 (D.V.I. 2004) (denying admission to applicant who had been admitted in another state, but then was disbarred in that state); *Ex parte* Wilkerson, 758 So. 2d 544, 548–49 (Ala. 1999) (ordering Alabama State Bar to rule for the first time). It is unclear whether Professor Rhode's numbers include such cases.

Three other clarifications should be made. First, as in Professor Rhode's study, remands with instructions to admit are coded as admitted. Second, cases are not double-counted within the same jurisdiction. If (as happens often) the applicant reapplies after a denial of admission, only the most recent published decision—whether that disposition is to admit, deny, or remand—is counted. Finally, suspended or disbarred attorneys' recertification determinations are not counted.

## C.  *Potential Reasons for the Rise*

There are numerous potential explanations for the marked increase in character review over the last quarter century.[50] Such explanations might include rises in the following: (1) the general population; (2) "flexible" admission standards that may give "problem" applicants more hope, causing them to apply more frequently than in the past;[51] (3) crime rates;[52] (4) the bar's protectionism and sensitivity to professional reputation;[53] (5) reported cases generally; and (6) the use or thoroughness of background checks.  Indeed, even the Watergate scandal may have had an effect on the sharp rise since the 1970s—by the expansive push for more ethical regulation in its aftermath.[54]

The most obvious contributing factor to the increase, however, is the significant rise in lawyers and bar applicants.  In 1985, for example, there were 655,191 lawyers, with a population to lawyer ratio of 360:1.[55]  By 2000, there were 1,066,328 lawyers, with a population to lawyer ratio of 264:1.[56]  Similar growth rates occurred over a significant portion of Professor Rhode's study as well.[57]

The point, however, is not to control for variables, crunch the numbers, and determine error rates; the point is much less complex:  The problem has gotten worse, not better.  The numbers show that in the first half-century's worth of data (1931 through 1982), there were a *total of thirty-seven reported cases* involving criminal record character review.  My study shows *eighty-eight cases* in the last twenty-four years, which is more

---

[50] *See supra* Table Three. I again thank Rick Fraser, J.D./M.B.A. Candidate, University of Chicago, for his helpful data analysis.

[51] *See, e.g.*, Carr, *supra* note 2, at 368 (discussing an apparent shift to "flexible" character review standards).

[52] *Cf.* Dzienkowski, *supra* 19, at 940 (estimating that a recent rise in criminal record disclosure on law school applications "is due in part to raising the age for consumption of alcohol and the recent increase in the war on drugs").

[53] *See infra* Parts IV–V.

[54] *See, e.g.*, STEVENS, *supra* note 12, at 237 ("Indeed, after Watergate, legal ethics became almost an industry in itself.").

[55] Clara N. Carson & Barbara A. Curran, Am. Bar Found., *Growth and Gender Diversity: A Statistical Profile of the Legal Profession in 2000*, RESEARCHING LAW, Winter 2005, at 1 tbl.1.

[56] *Id.*

[57] *See id.* (noting, for example, that numbers roughly doubled between 1960 and 1985).

than twice the amount in less than half the time.[58]  The data also show a huge time lapse between the date of applicants' criminal conduct and the date of application and a two-to-one ratio of denials to admissions, which are discussed below.

## IV.  ILLUSTRATIONS OF MODERN CHARACTER REVIEW IN THEORY AND APPLICATION

The following Charts illustrate that modern character screening is both unrealistic and perverse.  As currently applied, two related factors—the seriousness of the past criminal activity and rehabilitation—lead to these bizarre results: "[I]n the case of extremely damning past misconduct, . . . a showing of rehabilitation may be virtually impossible to make."[59]  In other words, the "weight of the added burden of demonstrating complete rehabilitation is determined by the gravity of the past criminal conduct."[60]

Thus, the worse the past crime, the higher the requisite showing of present good moral character.  This novel requirement—one that is unprecedented in moral philosophy—is unrealistic because few, if any, human beings can meet the high character threshold actually applied.[61]  Furthermore, it is perverse because the few that actually do meet the threshold—or at least come closer than admitted attorneys—nevertheless are denied admission.  It is unfortunate indeed that such exceptionally virtuous applicants are not allowed to practice law.[62]  Finally, their exclusion may deprive the profession of a

---

[58] For a listing of the criminal conduct involved, the time elapsed since the date of applicants' convictions, and the additional factors cited, see Appendices One through Three below.

[59] *See* cases cited *supra* note 39.

[60] *In re* King, 136 P.3d 878, 882 (Ariz. 2006).

[61] In fact, the bar treats many of these applicants unfairly by nitpicking at any misstep in their post-criminal behavior. The most common, and often technical, misstep is alleged lack of candor on the applicants' law school application or during the screening process concerning the underlying criminal misconduct. *See, e.g., In re* Wright, 690 P.2d 1134, 1135 (Wash. 1984) (en banc) (denying admission to applicant and noting that "[i]n his application . . . Wright represented that he was charged with possession of *.25 gram*[s] of heroin [when i]n fact he pleaded guilty to possession of *.65 gram*[s]" (emphasis added)); *infra* Part IV.C.

[62] *See, e.g., infra* Part IV.B.3, Chart Three, and Part IV.C; *see also* Carr, *supra* note 2, at 370 (noting that, as a result of the exclusionary practices generally, "the community may be denied the service of an active and dedicated individual who, quite possibly, has learned from past mistakes and who may now be more committed than many to ensuring that justice is served").

uniquely beneficial perspective—one that offers, among other traits, an insider's understanding of the criminal justice system and the client's point of view.

## A. Methodology

The methodology is rather uncomplicated, and it at first mimics the current character inquiry.[63]   The dots or arrows represent morally relevant events. I use the word "event" in the hope of not offending moral philosophers, many of whom prefer not to base normative theory in discrete actions. An event, then, could represent evidence of a particular virtue or vice, among other moral concepts. The inquiry focuses on all events before time *T*, which is the date of application. I chose to end the illustrations just before screening because, as we will see, courts often misconstrue events during screening, and these subsequent events are frequently unrelated to applicants' underlying criminal record. The Charts also reflect a somewhat Aristotelian ascension of character over an applicant's lifespan.[64]

---

[63] *See, e.g.*, Banks McDowell, *The Usefulness of "Good Moral Character,"* 33 WASHBURN L.J. 323, 326 (1994).

> Many, if not most, people are usually of good moral character, but not always . . . . They range along a continuum, usually acting above minimum standards, but at times falling below. Those who assess moral character are asked to make a global judgment, applying a complex set of criteria to reach a black and white, either-or decision.

*Id.*

[64] I balked at placing babies and young children in a low moral dimension, however, for hopefully obvious reasons. The long ascension after "bad" character events represents not only the necessary improvement in moral character, but also the necessary temporal distance from the negative event. Both factors— rehabilitation and length of time since misconduct—play a key role in assessing character. *See, e.g.*, NCBE GUIDE, *supra* note 21, ¶ 15, at viii (listing factors); *supra* Part II.

## B.   Character Review in Application and Theory

CHART ONE: APPLICANTS POSSESSING "GOOD" MORAL CHARACTER
UNDER THE CURRENT APPROACH



Good Moral
Character

Red-Flagged
Character

Bad Character

MORALLY RELEVANT EVENTS IN APPLICANT'S LIFE
PRIOR TO SCREENING

— ● Applicant One: Questionable but Good Moral Character

——▶ Applicant Two: Good Moral Character

- - - ▶ Applicant Three: Good Moral Character (The "Holmesian Bad Man")

CHART TWO: APPLICANTS POSSESSING BAD BUT
"REHABILITATED" MORAL CHARACTER (IN THEORY) UNDER THE CURRENT
APPROACH[65]



Moral Saints

Supererogatory/[66]
Super-Virtuous

Good Moral
Character

Red-Flagged
Character

Bad Character

MORALLY RELEVANT EVENTS IN APPLICANT'S LIFE
PRIOR TO SCREENING

——————▶ Applicant Four: Formerly Bad but "Rehabilitated" Character Despite
Serious Criminal Record

- - - - -▶ Applicant Five: Formerly Bad but "Rehabilitated" Character Despite
Horrendous Criminal Record

---

[65] This Chart is marked "in theory" because most, if not all, human behavior falls short.

[66] Supererogatory acts are those above and beyond the call of moral duty. *See, e.g.*, DAVID HEYD, SUPEREROGATION: ITS STATUS IN ETHICAL THEORY 1 (1982).

CHART THREE: APPLICANTS POSSESSING "BAD" MORAL CHARACTER
UNDER THE CURRENT APPROACH



MORALLY RELEVANT EVENTS IN APPLICANT'S LIFE
PRIOR TO SCREENING

——▶ Applicant Six: Bad Character in Light of Serious Criminal Record

- - - -▶ Applicant Seven: Bad Character in Light of Horrendous Criminal
Record

## C.  *Preliminary Conclusions*

The point of the preceding illustrations is not only to criticize enforcement, because such a limited criticism would be incomplete. An objector could concede that enforcement is failing while legitimately maintaining that the applicants in Chart Three should be denied admission. The solution would not be to "open the floodgates," but to extend enforcement to those who admittedly are falling below the screening radar (such as Applicants Two and Three in Chart One). The criticism, however, properly goes beyond inadequate enforcement.

The more important problem is that these applicants clearly should have been admitted.[67]  *In re King* is the prototypical example of the problem.[68]  First, the applicant presented

---

[67] Indeed, they arguably are more deserving of admission than the applicants passing the standard screening. *See supra* Chart One (listing, among other admitted applicants, the "Holmesian bad man," who had never engaged in a morally good act in his life). In Chart Three, for example, Applicants Six and Seven would not be admitted even though they have better moral character than Applicants One through Three in Chart One, who would be admitted.

[68] 136 P.3d 878, 886 (Ariz. 2006) (denying admission to an applicant who had

countless and consistent letters, witnesses, and affidavits attesting to his present good moral character. Second, and even more remarkably, he had been admitted and practiced law "in good standing with the Texas Bar [since 1994] and ha[d] never been the subject of a disciplinary grievance or sanction."[69]

The court nevertheless refused to admit the applicant, stressing that in light of his "extremely damning past misconduct . . . a showing of rehabilitation may be virtually impossible to make."[70] In convincing itself that the applicant had failed to make this "virtually impossible" showing, the court proceeded to engage in a hyper-technical inquisition of the applicant's behavior. Unsurprisingly, it managed to convince itself that this "impossible" showing had not been met relying on inconsistencies in the applicant's recounting of the offense (notwithstanding the fact that the applicant did not remember the events at issue because he undisputedly had been intoxicated—to the point of having to be virtually carried by officers at the time of the crime). The court also claimed that the applicant had not received enough alcohol counseling in the twenty-eight years since the crime.[71]

Unfortunately, this hyper-technical fetish for trivialities in applicants' lives is not confined to one case. The cases are replete with instances of exaggerated inconsistencies and harsh condemnations of morally ambiguous events.[72] Appendix I lists

---

committed attempted murder using a firearm twenty-eight years earlier).

[69] *Id.* at 887 (Hurwitz, J., dissenting).

[70] *Id.* at 882 (majority opinion) (quoting *In re* Mathews, 462 A.2d 165, 176 (N.J. 1983)); *see also id.* ("The weight of the added burden of demonstrating complete rehabilitation is determined by the gravity of the past criminal conduct."); *In re* Gossage, 5 P.3d 186, 203 (Cal. 2000) (denying admission to applicant who had committed voluntary manslaughter and noting that he failed to sustain the "heavy burden of proving his own rehabilitation"); *In re* Dortch, 486 S.E.2d 311, 320 (W. Va. 1997) ("[W]e agree with the majority of states that an applicant who has previously been convicted of a felony or other serious crime carries a heavy burden of persuading this Court that he presently possesses good moral character sufficient to be invited into the legal community of this State.").

[71] *See In re King*, 136 P.3d at 886.

[72] *See, e.g., In re* Hamm, 123 P.3d 652, 662 (Ariz. 2005); *see also id.* at 658 ("Indeed, we are aware of no instance in which a person convicted of first-degree murder has been admitted to the practice of law."); *In re* T.J.S., 692 A.2d 498, 502 (N.H. 1997) (denying applicant in part because his description of his eleven-year-old convictions was "too articulate, glib and adept at explaining away his past behavior"); *In re* Wright, 690 P.2d 1134, 1135, 1137 (Wash. 1984) (en banc) (denying admission to applicant who was convicted of second-degree murder and possession of heroine approximately ten years earlier and citing a lack of remorse and alleged

sixty denials of admission in the last twenty-four years; a denounced technicality or moral ambiguity can be found in nearly every one of them.[73]   This intellectual dishonesty is unbecoming of the bar.[74]   It is quite obvious that even an applicant who had managed to achieve mythical perfection would have been denied admission.[75]

Moreover, requiring moral sainthood is not necessarily desirable.  A prominent philosopher has argued, for example, that people generally neither want their friends to be, nor their children to become, moral saints.[76]   Furthermore, it is unclear whether a true moral saint would choose to become a lawyer; presumably, she would do so only if taking the time to become a lawyer would result in the optimum amount of good to others—and that is not a likely scenario.  Finally, one might well wonder whether a moral saint would make a good lawyer.[77]

---

unauthorized practice of law). In *In re Hamm*, the court cited, among other questionable factors, an alleged instance of plagiarism of a Supreme Court case in the applicant's brief to the court. A review of the opinion and the source of the alleged plagiarism—in addition to the standard legal practice of liberally borrowing from language in cases—leaves one wholly unconvinced that the applicant plagiarized. *See In re Hamm*, 123 P.3d at 661.

[73] It is true, however, that many of these cases contain misconduct that is not trivial or ambiguous. Even in those cases, however, important factors—like successful rehabilitation and community service—are ignored or discounted.

[74] *Cf., e.g.,* Iao v. Gonzales, 400 F.3d 530 (7th Cir. 2005) (criticizing the Board of Immigration Appeals and an immigration judge for intellectual dishonesty and arbitrariness in making credibility determinations and denying asylum applications); *infra* Part V. Because of the obvious interrelation in these matters, my use of the term "bar" includes the "bench" as well.

[75] *See In re Dortch*, 486 S.E.2d at 321 ("Though Mr. Dortch may have demonstrated that he has been rehabilitated, we believe the horrendous crime of which he was the prime conspirator outweighs his present good deeds. Indeed, the magnitude of his crimes constitutes an 'indelibly negative mark' on this applicant's record." (quoting *In re Avcollie*, 637 A.2d 409, 412 (Conn. Super. Ct. 1993))); *infra* Part V; *see also In re Hamm*, 123 P.3d at 658 ("Indeed, we are aware of no instance in which a person convicted of first-degree murder has been admitted to the practice of law.").

[76] *See* Susan Wolf, *Moral Saints*, 79 J. PHIL. 419, 431–34 (1982) (arguing that moral saints, among other problematic traits, would be single-minded and uninteresting). She also notes that it is unclear "whether there are any moral saints." *Id.* at 419. Mahatma Gandhi and Mother Teresa are perhaps the only popular images, and few choose to follow their example.

[77] The question is more provocative than meritorious: As noted above, for one, an applicant who has overcome a criminal past might bring uniquely good qualities to the practice.

With these perverse features of character review in mind, the following section discusses the strength of its underlying justifications.

## V.   THE MERIT OF MODERN CHARACTER REVIEW

This part addresses many, if not most, of the arguments for character screening.   Overwhelmingly, it concludes that character screening is meritless.   Its one meritorious feature is discussed last, because it points us in the right direction for the future of character screening in the Conclusion.

### A.   *Problems and False Justifications*

### 1.   Self-Image: A Shallow Justification

*[A] consideration should be the reputation of the bar.   If the crime is truly shocking, a court should deny admission—even if it concludes that the applicant has completely turned around— out of a decent respect for public opinion.   The mass murderer Ted Bundy was once a law student.   If he had won release from prison instead of being executed, are there any circumstances under which he might have been admitted to the bar?   I hope not.*[78]

Undisputedly, character review is supposed to be concerned solely with *present* good moral character.[79]   A review of the cases denying admission makes this claim untenable in reality.[80]   The median number of years since denied applicants' last offense is *nine years*, with the mean over ten years.[81]   The median number of years since admitted applicants' last offense is also nine years, with the mean over nine years.[82]   This fact, in and of itself,

---

[78] Stephen Gillers, *The Prudent Jurist*, LEGAL AFF., May/June 2004, http://www.legalaffairs.org/issues/May-June-2004/pj_mayjun04.msp.   The mass-murderer hypothetical is a common argument for screening.

[79] *See supra* Part II.

[80] *See infra* Appendix I (listing circumstances of the sixty published denials of admission over the last quarter century).

[81] The average is 10.27 years (N = 56). *See infra* Appendix I. Four cases did not list the years elapsed since date of conviction or (if no conviction) date of offense. *See infra* Appendix I. In general, the overall time in years would be slightly *higher*, because applicants usually are not convicted until months or years after the date of their offense.

[82] The average is 9.5 (N = 24). *See infra* Appendix II. One case did not list the years elapsed since date of conviction or date of offense. *See infra* Appendix II.

suggests perversity.[83]  A crucial factor in assessing rehabilitation and good moral character is the amount of time since the criminal conduct.[84]   We should expect, then, that admitted applicants would have longer periods without event.

Yet, the years elapsed are virtually identical.[85]   Clearly, another factor—the seriousness and nature of the offense—is doing the lion's share of the work.  That is because the worse the crime, the more likely it offends the bar's reputation and self-image.[86]   Furthermore, this fact partially suggests an explanation for the bar's pitiful forgiveness rate (i.e., that applicants are more than twice as likely to be denied admission in a published opinion).  As Table Three shows, applicants over the last quarter century have been denied sixty times, while being admitted only twenty-five times.[87]  Published opinions—*public* opinions—are not where applicants want to be.  It is reasonable to suspect that the bar routinely admits "problem" applicants under the radar.[88]  The problem applicants who are

---

[83] *See, e.g., In re* Haukebo, 352 N.W.2d 752, 754 (Minn. 1984) ("[B]ecause the evaluation is to be made of the applicant's present moral character, any pattern of immoral behavior must be sufficiently continuous or current to permit a reasonable inference that similar conduct can currently occur or may likely occur in the future." (citing *In re* Dileo, 307 So. 2d 362 (La. 1975))).

[84] *See supra* Part II and note 83. This factor is in addition to applicant's age at the time of the conduct.

[85] Actually, the number in years is *higher* for denials, but the numbers are so close, and given the variation in sample sizes, there is no statistical difference between admissions and denials. The median for all of the cases, including the three remands, is nine as well, and the average is 9.90 (N = 82). The standard deviation for the Deny group is 6.72 years. For the Admit group, it is 4.61 years. A two-sample $t$-test shows a $t$-statistic of 0.58 and a corresponding $p$-value of 0.57. In other words, we cannot reject the null hypothesis that the two means are equal at the 0.05 level.

[86] *See* Rhode, *supra* note 8, at 512.

> To prevent or deter individuals from entering a profession in order to promote the reputation, autonomy, or monopoly of existing members is troubling on constitutional as well as public policy grounds. Taken to its logical extreme, this rationale would support exclusion of any applicant whose conduct the local bar deemed unbecoming or likely to taint its public image. Particularly in a profession charged with safeguarding the rights of the unpopular, the price of such unbounded licensing discretion could be substantial.

*Id.*

[87] *See supra* Part III.B.3.

[88] This assumption is consistent with our experiences in Arizona, as well as the judicially noticeable facts that such large numbers of Americans have been arrested for or convicted of at least one crime (e.g., DUI/DWI or drug offenses) and all Americans arguably have committed at least some moral misconduct, yet the total number of moral character opinions is relatively low (involving significantly less

not admitted this way, however, have to resort to appeal to the state supreme court. There, the applicants risk a disposition in a published opinion. When that occurs, it is little wonder that the denial rate is so high:  The bar is making an official, public statement concerning its integrity and priesthood.[89]

Thus, what the bar is really concerned with is "reputable character," not "good moral character."[90]  Reputable character—the reputation of one's character in the relevant community—obviously is not equivalent to good moral character:  "A person may have a good character but suffer from a bad reputation."[91] Indeed, "a person may have a *bad character* but enjoy a good reputation."[92]  The three charts above testify to these facts.[93]  It therefore is difficult—nearly impossible actually—to fathom how the bar's inquiry bears a rational relationship to the fitness to practice law.[94]

---

than five percent of all applicants). Nevertheless, it should be disclaimed that no satisfactory study documents the number of "problem" applicants (assuming a satisfactory definition of "problem") who have been admitted without published opinions.

[89] *See* Rhode, *supra* note 8, at 510 ("Bar rhetoric traditionally has cast lawyers as 'sentinels' and 'high priests' at the portals of justice. That self-portrait demands at least the pretense of purity.").

[90] May, *supra* note 23, at 200–01; *see, e.g.*, Fla. Bd. of Bar Exam'rs *re* M.L.B., 766 So. 2d 994 (Fla. 2000) (examining applicant's public reputation to determine whether he had rehabilitated himself following his criminal conduct); *In re* Cason, 294 S.E.2d 520, 522 (Ga. 1982) ("For bar fitness purposes, rehabilitation is the reestablishment of the reputation of a person by his or her restoration to a useful and constructive place in society."); Elizabeth Gepford McCulley, Note, *School of Sharks? Bar Fitness Requirements of Good Moral Character and the Role of Law Schools*, 14 GEO. J. LEGAL ETHICS 839, 865 (2001) (proposing several forms of character review in order to increase "the public's image of lawyers").

[91] May, *supra* note 23, at 200–01.

[92] *Id.* at 201 (emphasis added); *cf.* NICCOLO MACHIAVELLI, THE PRINCE (Daniel Donno trans., Bantam Books 2003) (1532).

[93] In Chart Three, for example, Applicants Six and Seven would not be admitted even though they have better moral character than Applicants One through Three in Chart One, who would be admitted.

[94] Unless, of course, the bar ludicrously defines fitness to practice law as fitness not to tarnish the bar's reputation by having engaged in certain types of criminal activity many years earlier. *See, e.g.*, McChrystal, *supra* note 43, at 88 n.91.

> To permit a concern for the public image of the profession to stand as an independent basis for denying bar admission on moral character grounds substantially departs from the requirement that denial be based on conduct rationally connected with the applicant's fitness or capacity to practice law. Adverse public reaction . . . cannot be tantamount to unfitness to practice law, if unfitness to practice law is to be defined in a principled (i.e., rational) way.

*ST. JOHN'S LAW REVIEW*

This rabbit hole is deeper still. The bar is not concerned with reputable character in any meaningful sense. As we have seen, it routinely denies applicants of present reputable character.[95] Such denials would be wholly arbitrary under a reputable character standard. Instead, the bar is more concerned with "reputable *relational* character"—that is, whether an applicant's past conduct is consistent with the bar's perceived self-image.[96] This outlandish definition reconciles the cases— "fitness" to practice law is fitness to cohere with the bar's exalted self-image. This shallow vanity is unbecoming of an otherwise noble profession.[97]

---

*Id.* The psychological effect of the bar's regime is also questionable:

> It might be argued that people who think about legal careers at some formative psychological moment abandon their hopes, perhaps even unconsciously, because they realize that lawyers have high standards of moral character but that they themselves have such moral deficiencies that an alternative career, perhaps as a drug dealer or a physician in Minnesota, [which dropped its good moral character requirement,] would be more appropriate. The argument, in other words, is that the actual operation of character and fitness standards is irrelevant—what matters is the public perception. One could image such a mental process in the dream world of the American Bar Association seventy-five years ago, but not in our culture, not in a generation of L.A. Law watchers.

Baude, *supra* note 14, at 654.

[95] These applicants present countless testimonials of their solid reputable character, not only in the community generally, but in the legal community as well. *See supra* Part IV.C; *see also infra* Appendix I (citing cases denying admission to applicants).

[96] An applicant whose misconduct is inconsistent with this pristine priesthood of justice simply does not fit. Rhode, *supra* note 8, at 510; *cf. In re* Easton, 692 P.2d 592, 596 (Or. 1984) (per curiam) (denying applicant in part because he "holds a consistently low and cynical opinion of lawyers and lawyers' conduct").

[97] Professor Patrick Baude has suggested a stinging explanation for the persistence of character screening, which he argues serves two covert goals:

> On the one hand is the project of convincing potential customers that their lawyers will not cheat or otherwise harm them. This is an essential part of marketing any business: the contractor is bonded, the drug smuggler allows on-site inspection, and the lawyer can, at least implicitly, draw upon the *public* institutions regulating the bar to vouch for her integrity. . . .
>
> The other project is the Weberian enterprise of justifying the privileges of lawyers in the political and economic sphere. . . .
>
> The practical success of lawyers is in part dependent on preventing the public from seeing clearly the difference between the two projects. . . . The rule, the rhetoric, and the image of "character and fitness" are each a means of making these two distinct projects appear to be united. *But a large group cannot create illusions of this sort without coming to believe them. And what a group comes to believe has a way of becoming true.*

Baude, *supra* note 14, at 650 (emphasis added).

## 2.   The Displaced Values of Forgiveness and Redemption

The preceding data and conclusions reveal an impoverished role for forgiveness and redemption.[98] "The concept that human redemption is possible and valuable is both well established in law and premised upon long-standing, even ancient traditions."[99] On the surface, courts repeatedly "have stated that no offense is so grave as to preclude a showing of present moral fitness."[100]

As they have (probably inadvertently) admitted, however, "an applicant's subsequent exemplary behavior cannot lessen the enormity of an earlier offense."[101] The Supreme Court of Appeals of West Virginia plainly tipped the bar's hand in its ruling: "Though Mr. Dortch may have demonstrated that he has been rehabilitated, we believe the horrendous crime of which he was the prime conspirator outweighs his present good deeds. Indeed, the magnitude of his crimes constitutes an 'indelibly negative mark' on this applicant's record."[102] In fact, the bar's record generally reveals a poor appreciation of the values of forgiveness and redemption.[103] Moreover, it reveals a mistaken impression of "indelibly" negative marks; vicious acts are not necessarily signs of irreversibly evil character.[104]

In sum, a profession that routinely denies applicants for conduct that happened, on average, over nine years earlier—and

---

[98] Carr, *supra* note 2, at 372 ("Our legal system, with its origins in the Judeo-Christian ethos of repentance, forgiveness, and redemption, is not unforgiving. Lawyers should not be less inclined to forgiveness than the law itself, especially where rehabilitation appears to have been accomplished.").

[99] *In re* Prager, 661 N.E.2d 84, 92 (Mass. 1996) (denying admission to applicant who was convicted of four drug felonies relating to his large marijuana smuggling operation approximately eight years earlier).

[100] *Id.* at 91.

[101] *In re* Krule, 741 N.E.2d 259, 265 (Ill. 2000) (denying admission to applicant who was convicted of felony theft for an insurance fraud scheme approximately thirteen years earlier, citing also a lack of candor in law school applications).

[102] *In re* Dortch, 486 S.E.2d 311, 321 (W. Va. 1997) (quoting *In re* Avcollie, 637 A.2d 409, 412 (Conn. Super. Ct. 1993)) (denying admission to applicant who was convicted of second-degree murder, conspiracy, and attempted armed robbery approximately twenty-three years earlier); *see also In re* Hamm, 123 P.3d 652, 658 (Ariz. 2005) ("Indeed, we are aware of no instance in which a person convicted of first-degree murder has been admitted to the practice of law.").

[103] *See supra* Table Three; *infra* Appendix I.

[104] *See generally* PHILIP ZIMBARDO, THE LUCIFER EFFECT: UNDERSTANDING HOW GOOD PEOPLE TURN EVIL (2007) (documenting the heavy impact of "situational forces" on human misbehavior).

*ST. JOHN'S LAW REVIEW*

often when applicants were fairly young—devalues forgiveness and redemption.[105]

### 3. Additional Condemnation: Arbitrariness, Class Oppression, and Public Perception

The inconsistent and even arbitrary application of the character standard has been well documented elsewhere.[106] The standards are applied differently from state to state, within states, and applicant to applicant. Furthermore, the bar has managed somehow to overlook that "empirical research establishes no correlation between 'problem' applications and later disciplinary proceedings."[107] Although I fully agree with these criticisms, I do not wish to rehash them here; they currently are uncontested truths.

Several other negative attributes should be addressed instead. First, emphasis on criminal records disproportionately impacts certain racial groups and socioeconomic classes. To a large extent, this problematic phenomenon is undisputed and commonly known: "Empirical studies indicate that persons from lower socioeconomic areas are more likely to be arrested than persons living in higher income areas. Studies also note racial differences in arrest rates for adults as well [as] juveniles."[108]

Second, these requirements—which are not limited to the legal profession—often preclude felons from meaningful work.[109] Effectively, they are permanent outcasts, but living and struggling among us. Moreover, one might point out argumentatively that if the bar really cared about the public, it

---

[105] *See supra* Part V.A.1 (listing the mean and median amounts of time between conviction and date of opinion).

[106] *See* May, *supra* note 23, at 190–91, 197–200; *see also* Baude, *supra* note 14, at 650–51 (noting that Professor Rhode's conclusion "that the screening process is of little or no use" has neither been seriously attacked nor refuted, and that "browsing through current publications of the National Conference of Bar Examiners will reveal that Professor Rhode's work is generally accepted as a valuable scholarly study of the process rather than dismissed as a radical critique"); Rhode, *supra* note 8, at 529–46.

[107] Roots, *supra* note 1, at 35 (citing D. Larkin Chenault, *It Begins with Character . . .* , 77 MICH. B.J. 138, 139 (1998)); *see also* Rhode, *supra* note 8, at 555–62 (citing studies).

[108] Susan Saab Fortney, *Law Student Admissions and Ethics—Rethinking Character and Fitness Inquiries*, 45 S. TEX. L. REV. 983, 991 (2004) (footnotes omitted) (citing studies).

[109] *See* May, *supra* note 23, at 190–91, 193–94.

would lower its exclusionary practice in order to help lower crime:   By employing felons, society reduces the criminal recidivism rate.[110]   In sum, then, character screening causes de facto discrimination and may hurt society in other important ways as well.

Finally, there is a false justification for character screening that warrants only a cursory review and rebuttal.   This argument attempts to justify the current character screening regime "by the widespread perception that a state-issued license to practice law manifests state endorsement of character, and that the licensed individual is a person of honesty and integrity."[111] While the argument may be facially appealing, it is completely meritless in reality for at least three reasons: (1) the bar *itself* creates any "widespread perception" that does exist, and can disclaim it at any point, which is not likely to happen any time soon; (2) there is little to no evidence of this widespread perception in any event;[112] and (3) the current screening regime does not catch most of the problem applicants—indeed, as we saw above, it often excludes applicants with particularly *good* present moral character.   Thus, the justification is either self-created and self-perpetuated or nonexistent; either way, it is (an attempt at) outright false advertising.   And when this justification is removed, we see that the current regime is arbitrary and oppressive.

### 4.   The Misplaced Legal Education Objection

> *I am troubled by a public institution that uses taxpayer dollars to educate an individual who will have significant trouble in obtaining bar membership.   Also, it is easy to understand how deans of a public school will go to great lengths to avoid adverse publicity.*[113]

The legal education objection goes something like the following:   Because the purpose of law schools is to train lawyers,

---

[110] *Id.* at 187–88 (citing studies).

[111] Carr, *supra* note 2, at 372–73 & n.26 (citing, but noting that this source is more equivocal on the proposition, STEPHEN GILLERS, REGULATION OF LAWYERS: PROBLEMS OF LAW AND ETHICS 554 (3d ed. 1992)).

[112] Indeed, the evidence suggests the contrary. *E.g.*, McCulley, *supra* note 90, at 839, 869 (noting the "decline in the public's perception of the morality of lawyers").

[113] *See* Dzienkowski, *supra* note 19, at 937 (emphasis added) (footnote omitted).

law schools should not admit applicants who cannot be admitted to the bar due to character screening concerns. The problem with this argument is that it is nearly impossible to conclude that the sole purpose of legal education is to make lawyers. Once that truth is conceded, the objection loses its force.[114]

Legal education does not exist merely for "Hessian" training purposes. Harvard Law School—the second oldest, longest running, and arguably the best law school in the country—corroborated this fact in one of its first recruiting efforts: "The design of this Institution is to afford a complete course of legal education for gentlemen intended for the bar in any of the United States; *and* elementary instruction for gentlemen not destined for the bar, but desirous of qualifying themselves either for public life, or for commercial business."[115] Furthermore, in many other countries, law is not taught at trade schools, but as part of a liberal arts education.[116]

Indeed, any other concept of law effectively trivializes it. In no other academic discipline (save, but to a lesser extent, medicine) do we demand that graduates apply it in the market.[117] It is more than implicit in such an argument that law is meaningless without clients.[118] It is, however, certainly conceivable—perhaps even democratically required—that citizens qua citizens should want to learn the laws of the land

---

[114] *See id.* (acknowledging that "*if* a law school education has a benefit to a student, regardless of whether or not that student joins a bar association, then the character and fitness inquiry may be less important" (emphasis added)). It is ironic that a law professor would have to ask such a question.

[115] CATALOGUE OF THE OFFICERS AND STUDENTS OF HARVARD UNIVERSITY FOR THE ACADEMICAL YEAR 1838–9, at 28 (Folson, Wells, & Thurston 1838). Furthermore, the first university "chair" in law was not established for today's trade school purposes, but as part of a liberal arts education. *See* STEVENS, *supra* note 12, at 4–5 (discussing the first American chair in law established at the University of Virginia). Even back then, however, trade school roots were taking hold. *See id.* at 5 (discussing the university "mergers" between the "academic" and "practical" sides of legal education).

[116] *Cf.* STEVENS, *supra* note 12, at 4–5 (discussing the history of liberal legal education in America and some of its European counterparts).

[117] The mere thought of it must be terrifying—and perhaps even demeaning—to philosophers (among many others).

[118] Even conceding, arguendo, that law is useless without clients, the student can be her own client. *See, e.g.*, STEVENS, *supra* note 12, at 21 (suggesting that approximately *one-half* of the impetus for the University of Georgia Law School was to provide training for "young men who intend to devote themselves to the honorable employment of cultivating the estates they inherit from their fathers," and noting the same impetus at New York University).

*THE TROUBLING RISE*

and the processes by which they are adopted and enforced. Moreover, surely law has some significant academic usefulness in and of itself. Again, its use in other countries—and our own[119]— as a liberal arts background testifies to that fact.

The point here is not to convince the reader that law should be solely academic. It is not to win the academic answer for the age-old question, "Was the law school essentially a professional school, or was it instead an academic area of the university?"[120] The point is much less ambitious: There is academic value in legal education. The categorical arguments to the contrary are mistaken, or at least overstated.[121] Thus, the legal education objection logically does not preclude enrolling students who desire a legal education without bar membership.[122]

\* \* \*

After the preceding arguments have been rejected, and the discriminatory effect of character review flagged, the kernel of merit in the system can finally be explored.

## B. *The Limited Merit of Character Screening*

There is this much—and only this much—merit to the whole system: Once corrupt or professionally deficient actors have entered the legal profession, they often do a grave amount of harm before they are brought before the attorney disciplinary authorities.[123] Even then, they may not be disbarred the first

---

[119] Yale, for instance, offered a Bachelor of Civil Laws in the late nineteenth century. STEVENS, *supra* note 12, at 39. Today, most major universities offer undergraduate legal education through pre-law, political science, and justice studies curricula. *See id.* at 233 ("The idea of teaching law in the undergraduate degree as a liberal subject—stressing its historical, philosophical, and social science aspects— [has] achieved a new respectability.").

[120] *Id.* at 135; *see also* McCulley, *supra* note 90, at 855.

[121] *Cf.* STEVENS, *supra* note 12, at 135 (noting the belief—still held by many educators—that the "law school ha[s] a moral duty to fulfill *both* functions" (emphasis added)).

[122] As noted in the Conclusion below, law schools still have a duty to apprise problem applicants of the fact that they may be ineligible for bar admission because most students, of course, attend law school with the intent to become licensed attorneys.

[123] I thank Andrew Kaufman, Harvard Law School, for reminding me of this sad fact. *See, e.g.,* COQUILLETTE, *supra* note 27, at 613–14 ("[O]nce a morally bad lawyer has been detected and suspended, a lot of harm will have been done. In my experience, the harm to clients and others by such a lawyer cannot be made up by malpractice actions and money damages. Lives are well and truly ruined by such

time through the disciplinary process, and more damage may accrue to innocent clients until the second or third time. Thus, character screening, in theory, could help to prevent these walking travesties of justice from being admitted.[124]

The problem is that we do not know how to do it. This approach, for example, mandates prospective—as opposed to the customarily reactive—law-abidingness investigations. Yet, there is *no* evidence of our ability to *predict* the malpracticing attorney.[125] Perhaps someday we will have models to guide the delicate inquiries necessary to predict future moral judgments from past misconduct in different contexts, but today such models are noticeably absent from the legal profession.[126] Moreover, as the questions on bar applications demonstrate, prospective investigations are extremely destructive to applicants' privacy.[127] Finally, we should not forget that it is the bar that is charged with disciplining bad attorneys. It is difficult to justify instrumentally punishing applicants—who have never committed any attorney misconduct—because the bar's own

---

people.").

[124] We must be careful always to take the public safety rationale with a grain or two of salt. *See, e.g.*, Baude, *supra* note 14, at 648 ("What is touted as consumer protection—the admission process, restrictions on unauthorized practice, and judicial oversight—is just a cleverly disguised guild arrangement."). Rhode states:

> To prevent or deter individuals from entering a profession in order to promote the reputation, autonomy, or monopoly of existing members is troubling on constitutional as well as public policy grounds. Taken to its logical extreme, this rationale would support exclusion of any applicant whose conduct the local bar deemed unbecoming or likely to taint its public image. Particularly in a profession charged with safeguarding the rights of the unpopular, the price of such unbounded licensing discretion could be substantial.

Rhode, *supra* note 8, at 512.

[125] *See* Rhode, *supra* note 8, at 555–62 (citing numerous studies); *see also* Carrie Menkel-Meadow, *Private Lives and Professional Responsibilities? The Relationship of Personal Morality to Lawyering and Professional Ethics*, 21 PACE L. REV. 365, 389 (2001) (arguing that the legal profession should focus on attorney discipline—not character screening—and noting that "[p]redictions in advance of how particular people will behave later [are] notoriously unreliable, particularly when experts disagree about how predictive and stable 'character' is, especially in an age of the 'post-modern' self" (footnote omitted)).

[126] Given the highly situational nature of moral behavior, their development will be difficult. *See* Deborah L. Rhode, *Where Is the Leadership in Moral Leadership?*, *in* MORAL LEADERSHIP 23–33 (Deborah L. Rhode ed., 2006).

[127] Rhode, *supra* note 8, at 574–75. She also raises First Amendment and due process concerns. *Id.* at 566–74.

disciplinary enforcement is not what it should be.[128]   A fair solution seems to be more enforcement, not premature exclusion.

Therefore, Professor Rhode's recommendation over twenty years ago—namely, dismantle character screening and reallocate the saved resources to attorney disciplinary enforcement—rings as true today as it did then.[129]

CONCLUSION: PARTING ADVICE FOR PARTICIPANTS IN THE
CHARACTER REVIEW PROCESS

To note that the preceding discussion has been negative would be an understatement.  Its negativity in no way implies that good moral character should not be promoted; it should be.  But promoted—not perverted, devalued, and misappropriated for the bar's reputation and self-image.[130]

To change the mood to a more positive one, the following advice is offered to the participants in the process, namely applicants, committees, courts, and law schools.  Concededly, there is little to offer applicants; they should stay out of trouble— but they already have for years.[131]  The most important advice, beyond doubt, is to disclose—in meticulous detail—everything concerning criminal records.  Committees and courts routinely deny applicants in part for candor problems (whether actual or misconstrued).[132]

For the committees and courts, a compromise position is offered.  The proposed rule should read roughly:  Applicants convicted of a felony offense are ineligible to apply for admission to the bar until the later of (a) five years from the date of conviction or (b) completion of sentence, including probation or

---

[128] *See generally* David B. Wilkins, *Who Should Regulate Lawyers?*, 105 HARV. L. REV. 799 (1992) (listing some of the flaws in the bar's self-regulated disciplinary regime).

[129] As noted above, the most likely reason that this approach has not been implemented is its perceived "damage to the profession's image." Carr, *supra* note 2, at 374; *see also* Rhode, *supra* note 8, at 585.

[130] *Cf., e.g.*, McDowell, *supra* note 63, at 334 (arguing that character screening should be abandoned while maintaining that attorneys' actual good character should be promoted).

[131] *See supra* Part V.A.1.

[132] *See supra* Part II (discussing factors in bar admissions); *supra* Table Three (noting that alleged lack of candor during the screening process is an "additional factor" in criminal record character reviews); *infra* Appendix I (listing lack of candor as a factor in most denials of admission); *see also* MODEL RULES OF PROF'L CONDUCT R. 8.1 (2003) (requiring truthfulness of bar applicants).

parole.[133]     Part (a) reflects a compromise by imposing a categorical (yet generally reasonable) ban on admission for five years after the applicants' date of felony conviction. It serves the bar by assuring that applicants will not bring with them negative publicity regarding recent criminal convictions;[134] it does not disserve applicants seriously because five years approximates the amount of time that should be needed to get their lives back in order and complete law school.

Part (b) partially adopts the current regime.[135] That is, most states render ineligible applicants who still are serving their sentence, including probation or parole. As a practical matter, current prisoners will not be able to apply for the bar (unless, certain exceptions aside, they had graduated from an ABA-accredited law school and taken the bar exam before being imprisoned). The temporary preclusion of probationers and parolees does come up, however, but it makes some sense.

Such applicants are subject to various restrictions on their rights and liberties.[136] As a result, they would not have the same range—certainly range of motion—as other attorneys.[137] That,

---

[133] *See, e.g.*, MONT. R.P. COMM. ON CHAR. AND FIT. § 4(h) ("An applicant found guilty of a felony is conclusively presumed not to have present good moral character and fitness. The presumption ceases upon completion of the sentence and/or period of probation."). Some states effectively impose longer bans. *See, e.g.*, MO. SUP. CT. R. 8.04(a) (barring admission to felons for five years *after* the completion of their sentence); TEX. B. ADMISSION R. IV(d)(2). In their current form, these rules are unsatisfactory because five years from the completion of sentence imposes an unreasonably long waiting requirement. By the time of completion of probation or parole, applicants have completed their time in prison (if any) and most have been living as problem-free citizens for years. Indeed, the period of probation or parole provides behavioral monitoring that non-felon applicants lack.

[134] It also, of course, automatically screens those applicants—and only those applicants—who cannot refrain from criminal activity over a significant period of time.

[135] As noted above, however, it is mitigated. *See, e.g.*, MO. SUP. CT. R. 8.04(a) (barring admission to felons for five years *after* the completion of their sentence); TEX. B. ADMISSION R. IV(d)(2). Such rules often place an unreasonably long ban on applicants. *See supra* note 133.

[136] *See, e.g.*, *In re* Dortch, 860 A.2d 346, 363 (D.C. 2004) (holding, alternatively, that applicant was not "fit" to be admitted because he was still on parole).

[137] *Id.* at 362.

> Parolees are subject to ongoing official oversight and supervision, restrictions on their activities, and reincarceration for violating the conditions of their release. They remain subject to various civil disabilities as well. In the District of Columbia and elsewhere, for example, a person on parole for a felony offense is disqualified from serving as a juror.

*Id.*

however, could be remedied by limiting the scope of representation in writing; similar solutions are reached ethically between attorneys and prospective clients everyday. The more important problem would be the conflict of interest that would arise if probationers and parolees were to practice criminal law. It is quite reasonable to assume that such attorneys could not advocate fully against the same officials (prosecutors and probation officers), or at least the same departments, that literally control whether they return to jail or prison.[138] This concern, of course, is applicable only to criminal practice, and even that conflict likely could be avoided by an expansion or interpretation of Model Rule 1.7 to bar criminal practice temporarily.[139]

Finally, law schools should continue what they are doing—nothing (or nearly nothing).[140] Although most law schools ask criminal record questions on the law school application, it is the rare law school that actually screens for character.[141] With respect to questioning, however, law schools should ask only those questions designed to ensure institutional safety and academic integrity.[142] Relatedly, and obviously, they should not ask questions seeking information that they do not use.[143]

---

[138] *See* MODEL RULES OF PROF'L CONDUCT R. 1.7 (2003) (barring representation whenever "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to . . . a third person or by a personal interest of the lawyer"); *see also In re* Culpepper, 770 F. Supp. 366, 374 (E.D. Mich. 1991) (holding parolee ineligible for admission in part out of similar concern).

[139] *See generally* MODEL RULES OF PROF'L CONDUCT R. 1.7. Of course, the Model Rules disfavors restrictions on the right to practice in other contexts. *Id.* R. 5.6.

[140] Their inaction is justified:

> Schools are reluctant to make a serious effort to condition entrance on character requirements for a variety of justifiable reasons: first, the difficulty of obtaining sufficient reliable evidence; second, the possibility that character might change or be improved in the course of professional education; and finally, a profession's expertise may be studied and mastered by those who have no intention of ever practicing.

McDowell, *supra* note 63, at 328.

[141] *See, e.g.*, Dzienkowski, *supra* note 19, at 923, 940; McCulley, *supra* note 90, at 855.

[142] *See* Rhode, *supra* note 8, at 590 (noting that law schools' "institutional concerns dictate a certain degree of scrutiny, irrespective of what the bar formally requires").

[143] Dzienkowski, *supra* note 19, at 933. Furthermore, to elicit information that is used, law schools should be (more) careful not to draft ambiguous or otherwise inept questions. *See id.*

Furthermore, they should warn applicants that (1) bar committees may deny admission to applicants on the basis of their criminal record,[144] and (2) lack of candor on a law school application regarding criminal record is often grounds, or partial grounds, for denial of admission to the bar.[145] Again, to their credit, "most law schools tend to exclude consideration of character and fitness except in . . . serious cases."[146] They should continue to do so and not let the bar's poor example influence their practices. As with the profession, law school reputation in and of itself does not justify applicant screening or, even worse, denial of admission. Law schools (and the bar) can take some comfort in knowing that "[l]aw schools' academic criteria already exclude a large percentage of serious offenders."[147]

With that said, we have exhausted the discernable bases of character review. It should proceed no further than the foregoing compromises, and even the compromises should not be implemented as means of grounding and legitimating the regime, but as steps toward dismantling it. The time has come—belatedly—to forgive and forget this troubling mark on the legal profession's good moral character.

---

[144] *See, e.g., id.* at 936 ("Individuals with serious character issues may decide not to invest the time and money necessary to attend and complete law school.").

[145] *See id.* at 952–53, 55 (drafting a sample warning). Some law school applications properly warn applicants that, " 'when in doubt' " regarding a question's scope, " 'err on the side of full disclosure.' " *Id.* at 953 (quoting a University of Michigan Law School application).

[146] *See id.* at 940.

[147] Rhode, *supra* note 8, at 590.

APPENDIX I: APPLICANTS DENIED ADMISSION FOR BAD
CHARACTER: 1983 TO 2006

1.  *In re* G.L.S., 745 F.2d 856, 859–60 (4th Cir. 1984)
    (denying federal admission because applicant had been
    convicted of bank robbery sixteen years earlier, and also
    citing lack of candor relating to his time spent in prison).
2.  *In re* King, 136 P.3d 878, 884, 886 (Ariz. 2006) (denying
    admission to applicant who was convicted of attempted
    murder using a firearm twenty-eight years earlier, and
    also citing lack of candor and remorse).
3.  *In re* Hamm, 123 P.3d 652, 662 (Ariz. 2005) (denying
    admission to applicant who had committed first-degree
    murder during a drug deal thirty-one years earlier,
    citing also lack of candor and remorse).
4.  *In re* Gossage, 5 P.3d 186, 202–03 (Cal. 2000) (denying
    admission to applicant who had committed the
    voluntary manslaughter of his sister twenty-five years
    earlier in addition to sixteen other convictions or
    unprosecuted crimes occurring as recently as eighteen
    years earlier, and also citing lack of candor for failure to
    disclose thirteen of his seventeen convictions).
5.  *In re* Menna, 905 P.2d 944, 945 (Cal. 1995) (denying
    admission to disbarred, out-of-state attorney for "felony
    convictions for theft of client funds, failure to file a state
    income tax return, and manufacture of
    methamphetamine" over ten years earlier).
6.  Seide v. Comm. of Bar Exam'rs, 782 P.2d 602, 603, 605
    (Cal. 1989) (denying admission because applicant had
    several arrests during law school and one conviction for
    drug trafficking shortly thereafter, although applicant
    had a clean record for seven years by the time of
    decision).
7.  *In re* Dortch, 860 A.2d 346, 361–63 (D.C. 2004) (denying
    admission to applicant who had committed second-
    degree murder, attempted armed robbery, and
    conspiracy thirty years earlier, and holding alternatively
    that applicant was not "fit" to be admitted because he
    was still serving parole time).
8.  *In re* Wells, 815 A.2d 771, 772 (D.C. 2003) (denying
    admission to suspended, out-of-state attorney who had

been convicted of misdemeanor battery approximately sixteen years earlier).

9. *In re* Demos, 579 A.2d 668, 673–74 (D.C. 1990) (en banc) (denying admission to applicant who had been convicted of contempt and investigated for unauthorized practice of law approximately five years earlier).

10. Fla. Bd. of Bar Exam'rs *re* T.J.F., 770 So. 2d 676, 678–79 (Fla. 2000) (denying applicant who had been charged with theft three years earlier, citing also lack of candor and additional, though uncharged, "unlawful" conduct).

11. Fla. Bd. of Bar Exam'rs *re* M.L.B., 766 So. 2d 994, 994–96 (Fla. 2000) (denying admission to applicant who had been convicted of grand theft from his employer right before entering law school, citing also lack of candor).

12. Fla. Bd. of Bar Exam'rs *re* G.J.G., 709 So. 2d 1377, 1381 (Fla. 1998) (per curiam) (denying applicant who had been charged, but not convicted, of aggravated assault approximately six years earlier, and also citing additional factors including lack of candor and cheating on bar examination nine years earlier).

13. Fla. Bd. of Bar Exam'rs *re* R.B.R., 609 So. 2d 1302, 1302–04 (Fla. 1992) (per curiam) (denying admission to applicant who had been convicted of using a telephone to facilitate the commission of a felony approximately thirteen years earlier, and also citing numerous instances of lack of candor).

14. Fla. Bd. of Bar Exam'rs *re* R.D.I., 581 So. 2d 27, 30–31 (Fla. 1991) (per curiam) (denying applicant who had been charged with larceny and likely had engaged in other criminal activity approximately eleven years earlier, citing also lack of candor).

15. *In re* Adams, 540 S.E.2d 609, 610 (Ga. 2001) (per curiam) (denying admission to applicant who had been convicted of misdemeanor battery and had been involved in a separate instance of domestic violence approximately thirteen years earlier, and also citing lack of candor).

16. *In re* K.S.L., 495 S.E.2d 276, 277–78 (Ga. 1998) (per curiam) (denying applicant who had been arrested for entering cars with criminal intent to steal money

approximately eight years before, citing additional factor of alleged plagiarism of a law school paper).

17. *In re* J.W.N., 463 S.E.2d 114, 115–16 (Ga. 1995) (per curiam) (denying applicant who had been convicted of reckless driving, assault, and threatening phone calls, among other instances of misconduct, approximately six years earlier, and also citing questionable business practices).

18. *In re* W.D.P., 91 P.3d 1078, 1079–80, 1092 (Haw. 2004) (per curiam) (denying admission to out-of-state attorney who had been convicted of " 'feloniously engag[ing] in lewd fondling or touching' " of his minor daughters approximately seven years earlier, although his conviction was reversed on appeal, citing also numerous instances of alleged misconduct).

19. *In re* Krule, 741 N.E.2d 259, 265 (Ill. 2000) (denying admission to applicant who had been convicted of felony theft for an insurance fraud scheme approximately thirteen years earlier, and also citing lack of candor in law school applications).

20. *In re* Glenville, 565 N.E.2d 623, 627–29 (Ill. 1990) (denying admission to applicant who had been convicted of misdemeanor theft and had been arrested on several other occasions approximately six years earlier, and also citing applicant's alleged lack of candor).

21. *In re* Childress, 561 N.E.2d 614, 620–21 (Ill. 1990) (denying applicant who had been convicted of rape and robbery sixteen years earlier, and also citing lack of candor regarding the convictions on law school applications).

22. *In re* Peterson, 439 N.W.2d 165, 169 (Iowa 1989) (denying admission to applicant who was convicted of felony breaking and entering and possession of burglary tools and misdemeanor assault approximately thirteen years earlier, citing lack of candor regarding convictions during screening process).

23. *In re* Vendt, 924 So. 2d 89, 89–90 (La. 2006) (per curiam) (denying admission to applicant who was convicted of "three misdemeanor charges—simple battery, criminal mischief, and aggravated assault"—and was charged

originally with second-degree murder approximately six years ago).

24. *In re* Laughlin, 922 So. 2d 475, 476–77 (La. 2006) (per curiam) (denying admission to applicant who was convicted of driving while intoxicated and a felony drug offense at least six years earlier, and also citing lack of candor regarding offenses in his law school application).

25. *In re* Hinson-Lyles, 864 So. 2d 108, 111–12 (La. 2003) (per curiam) (denying applicant who was convicted of "two counts of felony carnal knowledge of a juvenile and one count of indecent behavior with a juvenile" approximately four years earlier).

26. *In re* Brown, 895 A.2d 1050, 1057–59 (Md. 2006) (denying admission to applicant who was convicted of bank fraud approximately fifteen years earlier, and also citing lack of candor).

27. *In re* Hyland, 663 A.2d 1309, 1310, 1317–18 (Md. 1995) (denying admission to out-of-state attorney who, before law school, "was convicted of fifteen counts of failure to file state sales tax returns" approximately nine years earlier, citing also lack of candor, among other factors).

28. *In re* Jeb F., 558 A.2d 378, 378–79 (Md. 1989) (denying admission to applicant who had been convicted and later absolved of all liability for armed robbery without specifying date of original conviction).

29. *In re* Charles M., 545 A.2d 7, 12 (Md. 1988) (denying applicant who was arrested for fraud by check approximately eleven years earlier, and also citing financial instability and lack of candor).

30. *In re* George B., 466 A.2d 1286, 1286 (Md. 1983) (denying admission to applicant who was convicted of attempted armed bank robbery over nine years earlier).

31. *In re* Admission to Bar of Commonwealth (*Krohn*), 828 N.E.2d 484, 487 (Mass. 2005) (denying admission to applicant who had been convicted of felony conspiracy and extortion approximately twenty-eight years earlier, and also citing other alleged misconduct).

32. *In re* Prager, 661 N.E.2d 84, 86–87 (Mass. 1996) (denying admission to applicant who had been convicted of four drug felonies relating to his large marijuana smuggling operation approximately eight years earlier).

33. *In re* Noske, 470 N.W.2d 116, 116–18 (Minn. 1991) (denying admission to applicant who had been convicted of assault approximately one year earlier, and also citing several instances of misconduct).

34. *In re* Brown, 467 N.W.2d 622, 623 (Minn. 1991) (denying admission to applicant who had been convicted of second-degree arson approximately five years earlier).

35. *In re* Matt, 829 P.2d 625, 625, 628, 630 (Mont. 1992) (denying admission to out-of-state attorney who was charged with conspiracy to possess cocaine ten years earlier, and also citing lack of candor).

36. *In re* Roger MM, 96 A.D.2d 1133, 1133, 466 N.Y.S.2d 873, 873 (3d Dep't 1983) (denying admission to applicant who was convicted of bank robbery and first-degree murder).

37. *In re* Moore, 303 S.E.2d 810, 815, 817 (N.C. 1983) (denying admission to applicant who was convicted of assault and battery upon a female and second-degree murder approximately seventeen years earlier, and also citing lack of candor and threatening and belligerent statements made approximately nine years earlier).

38. *In re* Elkins, 302 S.E.2d 215, 216, 217, 221 (N.C. 1983) (denying admission to applicant who was convicted of "illegal entry and secretly peeping into a room occupied by a female person" approximately eight years earlier, and also citing lack of candor).

39. *In re* T.J.S., 692 A.2d 498, 500–02 (N.H. 1997) (denying admission to applicant who was convicted of felonious sexual assault approximately eleven years earlier, and also citing lack of candor).

40. *In re* Dickens, 832 N.E.2d 725, 726, 728 (Ohio 2005) (per curiam) (denying admission to applicant who was charged with "two disorderly conduct charges, two harassment charges, a menacing charge, and a menacing-by-stalking charge," and also citing numerous instances of misconduct).

41. *In re* Bagne, 808 N.E.2d 372, 373, 375 (Ohio 2004) (denying admission to applicant who was convicted of aggravated assault approximately thirteen years earlier, and also citing lack of candor).

42. *In re* Hampton, 791 N.E.2d 962, 962, 963 (Ohio 2003) (per curiam) (denying admission to applicant who was charged six different times with operating a motor vehicle while intoxicated, with the last arrest occurring approximately two years earlier).

43. *In re* Barilatz, 746 N.E.2d 188, 188–89 (Ohio 2001) (per curiam) (denying admission to applicant who was convicted of misdemeanor possession of a concealed weapon in addition to having been jailed for contempt of court and failures to pay child support approximately seventeen years ago, and also citing lack of candor during the screening process).

44. *In re* Kapel, 717 N.E.2d 704, 704, 705 (Ohio 1999) (per curiam) (denying admission permanently to applicant who was charged with menacing and theft—charges that were later dropped—and with trespassing while trying to recover his automobile from a transmission shop, and who at another time was convicted of disorderly conduct approximately two years earlier); *see also In re* Kapel, 651 N.E.2d 955, 956 (Ohio 1995) (per curiam) (denying same applicant).

45. *In re* Cureton, 717 N.E.2d 285, 285, 286 (Ohio 1999) (per curiam) (denying admission to applicant who was convicted of disorderly conduct approximately one year earlier, and also citing business misconduct).

46. *In re* Nerren, 681 N.E.2d 906, 907 (Ohio 1997) (per curiam) (denying admission permanently to suspended, out-of-state attorney who was convicted of misdemeanor falsification and custodial interference approximately one year earlier, and also citing lack of candor and additional misconduct).

47. *In re* Mitchell, 679 N.E.2d 1127, 1127–28 (Ohio 1997) (per curiam) (denying admission to applicant who was convicted of misuse of credit card, forgery, and attempted transport of an unloaded weapon—in addition to having been charged with ticket scalping, approximately six years earlier—and also citing additional alleged misconduct).

48. *In re* Keita, 656 N.E.2d 620, 622–23 (Ohio 1995) (per curiam) (denying admission permanently to applicant who was convicted of armed robbery approximately

twenty-three years ago, and also citing lack of candor and other misconduct).

49. *In re* Carroll, 572 N.E.2d 657, 658 (Ohio 1991) (per curiam) (denying admission to applicant who was charged with possession of marijuana, receiving stolen property, and assault approximately ten years earlier, and also citing lack of candor).

50. Bean v. State *ex rel.* Okla. Bd. of Bar Exam'rs (*In re Bean*), 766 P.2d 955, 957, 958 (Okla. 1988) (denying admission to applicant who was convicted of misdemeanor possession of marijuana and controlled drugs, simple assault, and driving while intoxicated approximately four years earlier, and also noting that applicant may be unfit to practice law in light of his alcohol problems).

51. Vaughn v. Bd. of Bar Exam'rs for the Okla. Bar Ass'n, 759 P.2d 1026 1028, 1031 (Okla. 1988) (denying admission to applicant who was charged with sodomy, lewd molestation, and second-degree rape approximately five years earlier).

52. *In re* Covington, 50 P.3d 233, 233, 234, 238 (Or. 2002) (en banc) (denying admission to applicant who was charged with manufacture and distribution of marijuana approximately six years earlier, and also noting concern that applicant was unfit in light of his drug problems).

53. *In re* Fine, 736 P.2d 183, 186, 187–88, 191 (Or. 1987) (per curiam) (denying admission to applicant who was convicted of felony conspiracy and flight to avoid prosecution, which arose out of applicant's participation in a university bombing, approximately eleven years earlier, and also citing lack of candor during screening in applicant's testimony regarding the bombing).

54. *In re* Easton, 692 P.2d 592, 594–96 (Or. 1984) (per curiam) (denying admission to applicant who was convicted of felony custodial interference and held in contempt of court approximately seven years earlier, and also citing lack of candor and other misconduct).

55. *In re* Roots, 762 A.2d 1161, 1164, 1165, 1170 (R.I. 2000) (per curiam) (denying admission to applicant who was convicted of possession of an unregistered firearm, resisting arrest with violence, and shoplifting

approximately eight years earlier, and also citing lack of candor and other misconduct).

56. *In re* Wright, 690 P.2d 1134, 1134–37 (Wash. 1984) (en banc) (denying admission to applicant who was convicted of second-degree murder and possession of heroin approximately ten years earlier, and also citing lack of remorse and alleged unauthorized practice of law).

57. *In re* Dortch, 486 S.E.2d 311, 313 (W. Va. 1997) (denying admission to applicant who was convicted of second-degree murder, conspiracy, and attempted armed robbery approximately twenty-three years earlier).

58. Frasher v. W. Va. Bd. of Law Exam'rs, 408 S.E.2d 675, 676–77, 682 (W. Va. 1991) (denying admission to applicant who was convicted of driving under the influence on three occasions approximately three years earlier, and also citing numerous traffic offenses and apparent alcohol dependency).

59. *In re* Heckmann, 556 N.W.2d 746, 747, 748 (Wis. 1996) (per curiam) (denying admission to applicant who was convicted of underage drinking on three separate occasions, disorderly conduct, and driving without a license approximately three years earlier, and also citing lack of candor).

60. *In re* Martin, 510 N.W.2d 687, 687–89 (Wis. 1994) (per curiam) (denying admission to applicant who was convicted of forgery and seven counts of aiding and abetting transportation of forged checks approximately sixteen years earlier, and also citing lack of candor on applications).

APPENDIX II: APPLICANTS ADMITTED FOR DEMONSTRATING
REHABILITATED CHARACTER: 1983 TO 2006[148]

1. Hightower v. State Bar of Cal., 666 P.2d 10, 11–12, 14
   (Cal. 1983) (admitting applicant who had engaged in
   three instances of unauthorized practice of law and had
   been convicted of contempt arising out of one of those
   instances approximately six years earlier).

2. *In re* Kleppin, 768 A.2d 1010, 1013, 1018 (D.C. 2001)
   (per curiam) (admitting applicant who had been denied
   admission in Florida, despite his conviction for
   conspiracy to distribute marijuana ten years earlier, but
   noting that applicant failed to disclose the conviction on
   one of his law school applications).

3. *In re* Manville, 538 A.2d 1128, 1134–35 (D.C. 1998) (en
   banc) (admitting *three applicants* who had been
   convicted of manslaughter, attempted armed robbery of
   a bank, and selling narcotics over ten years before their
   applications).

4. *In re* Sobin, 649 A.2d 589, 589 (D.C. 1994) (admitting
   applicant "despite . . . [his] felony convictions for
   conspiracy to manufacture a controlled substance and
   aiding and abetting both interstate prostitution and
   interstate transportation in aid of interstate
   racketeering" approximately seven years earlier).

5. *In re* Polin, 630 A.2d 1140, 1141–42 (D.C. 1993)
   (admitting applicant who had been convicted of
   conspiracy to distribute cocaine approximately nine
   years earlier).

6. Fla. Bd. of Bar Exam'rs *re* D.M.J., 586 So. 2d 1049,
   1049–51 (Fla. 1991) (per curiam) (admitting applicant
   despite concluding that applicant had engaged in a
   conspiracy to import cocaine twelve years earlier,
   although applicant had been acquitted in his criminal
   trial).

---

[148] *In re Ansell* is not included because its disposition is unclear. *See In re
Ansell*, 788 So. 2d 1172, 1173 & n.1 (La. 2001) (per curiam) (admitting applicant
conditionally who had entered a deferred prosecution agreement for possession of
marijuana and possession of drug paraphernalia at least two years earlier). *But see
In re Ansell*, 801 So. 2d 1064, 1064 (La. 2001) (ordering applicant's conditional
admission revoked pending further hearings).

7. *In re* VMF, 491 So. 2d 1104, 1104, 1107 (Fla. 1986) (per curiam) (admitting applicant who had been charged with possession and delivery of marijuana approximately nine years earlier, but noting applicant's lack of candor during screening).

8. *In re* Bryant, 922 So. 2d 471, 471–72 (La. 2006) (per curiam) (admitting applicant who was convicted of possession of cocaine with intent to distribute approximately eleven years earlier, and also citing delinquent credit accounts).

9. *In re* Hughes, 594 A.2d 1098, 1099 (Me. 1991), *aff'd*, 608 A.2d 1220, 1221 (Me. 1992) (admitting resigned, out-of-state attorney who was convicted, approximately eleven years earlier, of two counts of false statements on real estate closing forms in an effort to divert funds from clients).

10. *In re* James G., 462 A.2d 1198, 1199, 1202 (Md. 1983) (admitting applicant who had been convicted of "forgery," "uttering," and assault, and who had been charged with—but not convicted of—two separate murders approximately thirteen years earlier).

11. *In re* Birmingham, 866 P.2d 1150, 1151–52 (Nev. 1994) (admitting applicant who was convicted of conspiracy to distribute marijuana eleven years earlier).

12. *In re* Strait, 577 A.2d 149, 150, 157–58 (N.J. 1990) (admitting applicant who was charged with possession of cocaine and narcotics paraphernalia in addition to having been convicted of various drug and assault offenses approximately five years earlier, and rejecting committee's finding of lack of candor).

13. *In re* Newhall, 143 A.D.2d 293, 294, 532 N.Y.S.2d 179, 180 (3d Dep't 1988) (admitting applicant who was convicted of assault in the second degree approximately nine years earlier).

14. *In re* Kesselman, 100 A.D.2d 606, 606, 473 N.Y.S.2d 826, 826–27 (2d Dep't 1984) (admitting applicant who was convicted of criminal sale of a controlled substance in the third degree approximately seven years earlier).

15. *In re* Beers, 118 P.3d 784, 785, 791 (Or. 2005) (per curiam) (admitting applicant who was convicted of felony conspiracy to distribute cocaine in addition to

having been convicted of various misdemeanors approximately thirteen years earlier, but noting minimally a lack of candor).

16. *In re* Jaffee, 874 P.2d 1299, 1300–01, 1305 (Or. 1994) (per curiam) (admitting previously denied, out-of-state attorney who eight years earlier was convicted of manufacture of marijuana and who violated probation by threatening violence and possessing firearms, noting that in California the applicant-attorney had been suspended but was later reinstated).

17. *In re* Tobiga, 791 P.2d 830, 834–35 (Or. 1990) (admitting applicant who was charged with shoplifting approximately five years earlier and noting, but rejecting, lack of candor concerns).

18. *In re* Rowell, 754 P.2d 905, 906–07, 910 (Or. 1988) (per curiam) (admitting applicant who was convicted of possession of marijuana with intent to sell and possession of cocaine in addition to other illegal drug activity approximately seven years earlier).

19. *In re* Ogilvie, 623 N.W.2d 55, 56, 58 (S.D. 2001) (admitting applicant who was convicted twice for driving under the influence and accused of abusive behavior toward his former girlfriend).

20. Tex. State Bd. of Law Exam'rs v. Malloy, 793 S.W.2d 753, 758–60 (Tex. App. 1990) (admitting applicant who, two years prior, was charged with two low-class misdemeanors and another charge that ultimately was dismissed because the rules of court barred the committee below from considering such misdemeanors and offenses, and noting, but discounting, applicant's apparently resistant and cursory responses on his bar application).

21. *In re* McMillian, 617 S.E.2d 824, 827, 830 (W. Va. 2005) (per curiam) (admitting previously denied applicant who was convicted of felony wiretapping approximately ten years earlier, and also citing concerns regarding applicant's discharge from a previous job approximately eighteen years earlier).

22. *In re* Vanderperren, 661 N.W.2d 27, 33–34, 41 (Wis. 2003) (per curiam) (remanding with instructions to admit applicant who was "'cited for three alcohol-

related offenses, six motor vehicle offenses, and one offense each for assault, trespass, disorderly conduct, fraudulently obtaining a driver's license and using it to operate a motor vehicle, and for resisting arrest'" approximately four years earlier, and also citing lack of candor (quoting the board's Finding of Fact 3.A)).

23. *In re* Rippl, 639 N.W.2d 553, 555–56, 560, 562 (Wis. 2002) (per curiam) (admitting applicant who was convicted of misdemeanor theft and cited for disorderly conduct approximately four years earlier, but noting psychological instability).

APPENDIX III: CASES REMANDING MORAL CHARACTER
DETERMINATIONS: 1983 TO 2006

1. Scott v. State Bar Examining Comm., 601 A.2d 1021, 1023, 1030 (Conn. 1992) (remanding trial court's grant of admission to applicant who had been convicted of possessing marijuana, among other offenses, approximately seven years earlier).

2. *In re* Watts, 557 A.2d 601, 602 n.3, 603 (D.C. 1989) (remanding for further proceedings committee's denial of admission despite the fact that applicant had been convicted of two different felonious thefts during law school approximately ten years earlier).

3. *In re* Haukebo, 352 N.W.2d 752, 753, 756 (Minn. 1984) (remanding for further proceedings committee's denial of applicant who had been convicted of three counts of driving while intoxicated approximately three years earlier).